UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------- X

UNITED STATES OF AMERICA

      - against -                          Docket No. <u>21-CR-572 (S-1) (EK)</u>

 BRIAN CASTRO,
 MUSAH COWARD,
    and
 CHARLES POWELL,

                Defendants.

---------------------------------------------- X


MUSAH COWARD'S MOTION FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE
FEDERAL RULES OF CRIMINAL PROCEDURE



                            By: Sabrina Shroff
                             Gary Villanueva

                           Counsel to Musah Coward


TO: UNITED STATES ATTORNEY
    Eastern District of New York
    271 Cadman Plaza East Brooklyn,
    New York 11201

I.    **THE COURT SHOULD GRANT MR. COWARD A NEW TRIAL IN THE INTERESTS OF JUSTICE BECAUSE OF A FRAUD PERPETRATED BY GOVERNMENT WITNESS CARLOS GOMEZ, AND THE FACTS OF THAT FRAUD SHOULD BE UNSEALED AND MADE PART OF THE PUBLIC RECORD**

At Mr. Coward's original trial, the government introduced the testimony of cooperating witness CW-1, Carlos Gomez. The testimony was a key part of the prosecution's case. During the robbery and killing at issue, Mr. Coward had been the getaway driver. He had never entered the gambling spot during the robbery and did not shoot the bouncer during that robbery. The testimony of Gomez was used to introduce other crimes evidence regarding Mr. Coward, and tie Coward to the guns assertedly used in robbery.

Gomez had recorded a conversation he had with co-defendant Brian Castro[1] on or about November 28, 2020, shortly after the robbery. As Castro and Gomez sat in Gomez's car smoking marijuana, Castro made various inculpatory statements about himself, but he also discussed the other defendants. As relevant here, Castro assertedly stated that Coward had given him the gun he used in the robbery at issue, and that Coward later sold the gun. The recording was played to the jury as part of Gomez's testimony at trial. In addition, Gomez testified that Mr. Coward sold drugs with Castro from an abandoned gas station in 2017 or 2018.

Gomez's testimony was devastating to Mr. Coward's defense – it enlarged his role in the offense, tied him more tightly to the other co-defendants, and supported the government's claim that Mr. Coward was a gang member and drug dealer. Despite this, defense counsel made the decision not to cross-examine Mr. Gomez and let his damning testimony go to the jury unchallenged. Defense counsel made that decision to avoid opening the door to testimony from Gomez that Coward had tried to have Gomez assassinated to prevent him from testifying at the trial.

---

[1] Defendant Brian Castro joins in Mr. Coward's motion for a new trial.

Actually, Gomez engineered his own shooting, so he could claim he was too scared or injured to testify against Coward at trial. But by the time the government informed the Court and defense counsel that Gomez had lied, it was too late. Coward already had been convicted.

On January 15, 2025, during the trial, the government notified the Court that one of its key witnesses, Carlos Gomez, had narrowly escaped an assassination attempt the day before he was supposed to testify. Per Mr. Gomez, three masked men had tried to kill him for being a "rat," but only managed to shoot him in his leg. *See* ECF No. 245. The government immediately accused Mr. Coward of arranging the assassination to prevent Mr. Gomez from testifying at trial and sought to have this event published to the jury as "other crimes" evidence. *Id.* While the Court did not permit the government to affirmatively introduce the assassination testimony during its case-in-chief, the risk remained that it would be admitted on rebuttal. To avoid this outsized risk, defense counsel did not cross-examine Gomez.

Just over a month later, the government recanted the assassination story, admitting it was entirely fictional. *See* February 20, 2025 Government Letter [ECF No. 307] (hereafter, "Letter") at 1-3. Mr. Gomez had planned his own shooting because he did not want to testify, arranging "to be shot in the foot or in the leg … the day before [he] was scheduled to testify" at trial. Letter at 2. At the government's request (*id.* at 4), the Court sealed the Letter in its entirety.

### A. The Court Should Grant Mr. Coward a New Trial In the Interest of Justice Because Gomez's Fraud Materially Tainted and Prejudiced Mr. Coward's Defense

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The interest of justice requires that the Court grant Mr. Coward a new trial here.[2]

---

[2] As this request for a new trial is based on newly discovered evidence unavailable before or during trial, the request is timely. *See* Fed. R. Crim. P. 33(b)(1) ("*Newly Discovered Evidence.* Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict

Let us be clear about what happened. A key witness accused Mr. Coward of trying to kill him to prevent him from testifying at Mr. Coward's trial. Such testimony would have guaranteed Mr. Coward's conviction. Not only would Mr. Coward arranging a cold-blooded assassination paint him as a killer who knew other killers, but the attempted assassination would have conclusively bolstered the veracity and importance of all of Gomez's testimony. After all, if Mr. Coward was willing to have him killed to prevent him from testifying, Gomez's testimony must have been important and true. Otherwise, why risk trying to kill him?

Gomez's fraud did not prevent him from testifying, but the devastating nature of his fraudulent story did prevent him from being cross-examined by defense counsel. Had defense counsel known that the story was a fraud, the outcome would have been completely different. Gomez's willingness to falsely claim Coward had tried to kill him, and his willingness to hire others to participate in the fraud and shoot him in the leg, would have called into serious question and disrepute every bit of testimony proffered by him. Irrespective of topic, what jury could possibly believe any testimony proffered by someone willing to go to such lengths to falsely accuse someone else of attempted murder? And how could a jury not question a prosecution willing to put someone like Gomez on the witness stand?

"Where newly discovered evidence demonstrates that a principal government witness committed perjury, we [the Court] must determine whether the jury 'probably' would have altered its verdict had it known of the witness' false testimony." *United Staes v. Wallach*, 935 F.2d 445, 458 (2d Cir. 1991) ("*Wallach I*"), overruled in other part by *Ciminelli v. United States*, 598 U.S. 306 (2023). In making that determination, "the court should decide whether the jury probably would have altered its verdict if it had had the opportunity to appraise the impact of the newly-

_____

or finding of guilty.").

discovered evidence not only upon the factual elements of the government's case but also upon the credibility of the government's witness." *Id.* (quoting *United States v. Seijo*, 514 F.2d 1357, 1363-64 (2d Cir. 1975)). This is because "a witness's credibility could very well be a factor of central importance to the jury, indeed every bit as important as the factual elements of the crime itself." *Wallach I*, 935 F.2d at 458 (quoting *United States v. Stofsky*, 527 F.2d 237, 246 (2d Cir. 1975)). "The taint of false testimony is not erased because his untruthfulness affects only his credibility as a witness. 'The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence.'" *Id.* (quoting *Seijo*, 514 F.2d at 1364).

Thus, in *Wallach I*, the Second Circuit reversed a conviction because a government witness (Mr. Guariglia) had perjured himself by claiming he was no longer a compulsive gambler, a false statement discovered by the government only after the witness testified and the trial was completed. *Wallach I*, 935 F.2d at 456. As the Second Circuit later explained in *United States v. Wallach*, 979 F.2d 912 (2d Cir. 1992) ("*Wallach II*"), even though the falsity was unrelated to the offense itself, "a jury, aware of the falsity of Guariglia's sworn denial of gambling, would likely have disbelieved his accusations against Wallach" and acquitted him. *Wallach II.* 979 F.2d at 914. "Guariglia's false testimony regarding his gambling directly calls into question the veracity of the rest of his statements." *Wallach* I, 935 F.2d at 458. The same reasoning is called for here.

There is no question that Gomez's lie was material and materially impacted Mr. Coward's defense. *See United States v. Johnson*, 2024 U.S. App. LEXIS 32310, *13 (2d Cir. Dec. 20, 2024) (explaining that perjury is "material" if the witness's testimony "was important to the government's case" and "meaningfully undermined by the perjury"). Likewise, the circumstances create "a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Wallach I*, 935 F.2d at 456; *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988).

Where these two conditions – materiality and a firm belief – are met, the conviction must be reversed and a new trial ordered. *Wallach I*, 935 F.2d at 459.

Here the interests of justice require a new trial. Mr. Coward is entitled to be tried without the damning but tainted testimony of Gomez, or with Gomez subject to cross-examination by defense counsel as to his assassination lie.

**B. The Court Should Unseal the Government's February 20, 2025 Letter [ECF No. 307] Because the Government Has Not Met Its Heavy Burden of Proving the Letter Must Remain Sealed**

The Court should unseal the Letter.[3] Public access to court filings is the norm. *Nixon v. Warner Communications*, Inc., 435 U.S. 589, 597 (1978). As the government expressly concedes (Letter at 4), sealing is disfavored; it is only permitted if properly supported and narrowly tailored. *Lugosch v. Pyramid Co.*, 435 F.3d 110, 119-120 (2d Cir. 2006). "Specific, on the record findings" are necessary to support sealing, and, even then, any sealing should be "narrowly tailored. *Id. See also United States v. Aref*, 5 533 F.3d 72, 83 (2d Cir. 2008) (stating that trial courts are required to "avoid sealing judicial documents in their entirety unless necessary").

As the sealing proponent, the government was required to place specific facts and findings on the record. *Lugossch*, 435 F.3d at 119-120. The government, however, has never done so. Rather than offer an affidavit or the testimony of someone with first-hand personal knowledge, the government continues to rely on the unsworn, second-hand averments in its Letter as the sole basis for why the Letter should be sealed. Such self-serving averments are not enough to meet the government's heavy burden. *See, e.g., Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) ("An attorney's unsworn statements in a brief are not evidence.") (citing *INS v. Phinpathya*, 464 U.S.

---

[3] The government filed several letters (January 2, and January 10, 2025) seeking to keep secret from the public, the name identity of its lying cooperator. As it is now clear that the only threat to the cooperator came from the cooperator himself, those document should be unsealed. ECF NOS. 193, 209, 211, 217 and 227 should also be publically filed.

183, 188-89 n.6 (1984)); *United States v. Lysaght*, 2018 U.S. Dist. LEXIS 193707, *2 n.1 (S.D.N.Y. November 14, 2018) (same). For this reason alone, the Letter should be unsealed.

Moreover, the justifications the government proffered in support of sealing are unpersuasive – particularly now, almost five months after Mr. Gomez perpetrated his scam. In moving to seal, the government contended sealing was

> warranted (1) to guarantee the integrity of the government's ongoing grand jury investigation into the Shooting; (2) to ensure the safety of Individuals-1 and -2 who made post-arrest statements to law enforcement and whose provision of information to the government has not been publicly disclosed; and (3) because the extent of this ongoing criminal investigation is unknown to other subjects of the investigation and disclosure would alert those subjects to the focus, extent, or direction of the investigation.

Letter at 4. Those justifications are no longer sufficient.

Sealing is not required to ensure the safety of Individuals-1 and -2 where the names of those Individuals were never disclosed in the Letter, and that they were providing information to the government has either been disclosed to Mr. Gomez or is now known to him based on subsequent events. *See* Letter at 3 (stating that "CW-1 [Mr. Gomez] has declined to speak with the government" about the matter).  Likewise, any purported "ongoing grand jury investigation" in January or February is likely completed by now. Thus, whatever evanescent persuasive value the government's raw speculation about potential harm may once have had months ago, it no longer exists. Sealing is no longer justified. For this additional reason the letter should be unsealed. *See, e.g., United States v. Smith*, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013) (sufficient showing of harm to support sealing "must be based on a particular factual demonstration of potential harm, not on conclusory statements" unsupported by the facts).

The only real motivation the government may have to insist that the Letter remain sealed is embarrassment. Mr. Gomez, the government's prolific and serial cooperator and witness, has shown himself to be a fraudster and a liar. That the government may be embarrassed, however,

does not constitute good cause to keep the Letter sealed.

In *Joy v. North*, for example, a district court sealed a report and accompanying documents regarding a bank's internal operations "which, if made public, would adversely affect the two corporations in the banking industry and the Bridgeport community." 692 F.2d 880, 894 (2d Cir. 1981). The Second Circuit reversed the sealing order, because the good cause proffered was "patently inadequate" to meet defendants' heavy burden of justifying sealing. *Id.* The Second Circuit explained:

> a naked conclusory statement that publication of the report will injure the bank in the industry and local community falls woefully short of the kind of showing which raises even an arguable issue as to whether it may be kept under seal. … The potential harm asserted by the corporate defendants is in disclosure of poor management in the past. That is hardly a trade secret. The argument that disclosure of poor management is so harmful as to justify keeping the Report under seal proves too much since it is a claim which grows stronger with the degree of misconduct. Were outright looting of Citytrust disclosed by the Report, for example, the harm of publication would be even greater.

*Joy*, 692 F.2d at 894. The same reasoning and conclusion apply here. The government should not be permitted to successfully hide the improper acts of its erstwhile witness from the public. The Letter should be unsealed.

Respectfully Submitted,

_____/s_____
Sabrina Shroff & Gary Villanueva
Counsel to Musah Coward
80 Broad Street, 19th Florr
New York, New York 10004


cc: All Parties