FTB:AP/ML/RSB
F. #2021R00987

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

       - against -               Docket No. <u>21–CR-572 (S-1) (EK)</u>

BRIAN CASTRO,
       also known as "Morenaje,"
MUSAH COWARD,
       also known as "General Mecka,"
       "Red" and "The General Red," and
CHARLES POWELL,
       also known as "Payback,"

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -X

## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTIONS FOR ACQUITTAL AND A NEW TRIAL

JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrés Palacio
Megan Larkin
Raffaela S. Belizaire
Assistant U.S. Attorneys
(Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

  I. Background .................................................................................................................. 2

    A. The Evidence at Trial ............................................................................................. 3

      1. The Plan to Rob the Gambling Spot .................................................................. 4

      2. The Robbery of the Gambling Spot and the Murder of Rodney Maxwell ........ 9

      3. The Aftermath of the Robbery and the Castro Confession ............................. 12

      4. The Relationships Between the Defendants .................................................... 15

    B. The Jury's Verdict ................................................................................................ 15

    C. Post-Trial Evidence of Carlos Gomez's Involvement in His Own Shooting ............ 16

  II. The Defendants' Motions Should be Denied ................................................................. 19

    A. Legal Standards .................................................................................................... 19

      1. Rule 29 ........................................................................................................... 19

      2. Rule 33 ........................................................................................................... 22

        a. Generally .................................................................................................... 22

        b. Newly Discovered Evidence ..................................................................... 24

    B. The Evidence Proved the Defendants' Guilt Beyond a Reasonable Doubt ................ 25

      1. The Evidence Proved that a Robbery Occurred ............................................. 25

      2. The Evidence Proved an Effect on Interstate Commerce ............................... 26

        a. The Gambling Spot is a Business
          Dealing in Items That Travel in Interstate Commerce ............................... 29

        b. The Defendants' Robbery
          Had at Least a *De Minimis* Effect on Commerce ..................................... 32

      3. Powell's Felon-in-Possession Conviction
        Was Supported by the Evidence and Legally Proper ...................................... 36

C.  The Defendants Are Not Entitled to a New Trial ........................................................ 39

   1.  Collateral Evidence About Carlos Gomez's Shooting Does Not Require a
   New Trial ................................................................................................................... 39

      a.  The Newly Discovered Evidence
          Would Not Have Altered the Jury's Verdict................................................ 40

   2.  Powell's Additional Arguments Do Not Require a New Trial........................ 46

CONCLUSION............................................................................................................................... 51

# TABLE OF AUTHORITIES

Page(s)

## CASES

Amorgianos v. Nat'l R.R. Passenger Corp.,
 303 F.3d 256 (2d Cir. 2002)......................................................................... 57

Bruton v. United States,
 391 U.S. 123 (1968)............................................................................... 58, 59

Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 509 U.S. 579 (1993)..................................................................................... 57

Richardson v. United States,
 526 U.S. 813 (1999)..................................................................................... 46

Taylor v. United States,
 579 U.S. 301 (2016)..................................................................................... 45

United States v. Anderson,
 747 F.3d 51 (2d Cir. 2014).......................................................................... 30

United States v. Archer,
 977 F.3d 181 (2d Cir. 2020)........................................................................ 32

United States v. Autuori,
 212 F.3d 105 (2d Cir. 2000)........................................................................ 29

United States v. Barner,
 561 F. App'x 33 (2d Cir. 2014) ............................................................. 46, 47

United States v. Bin Laden,
 397 F. Supp. 2d 465 (S.D.N.Y. 2005).......................................................... 52

United States v. Canova,
 412 F.3d 331 (2d Cir. 2005)........................................................................ 31

United States v. Choudhry,
 330 F. Supp. 3d 815 (E.D.N.Y. 2018) ............................................... 51, 52, 53

United States v. Cruz,
 363 F.3d 187 (2d Cir. 2004)........................................................................ 57

United States v. DiPaolo,
 835 F.2d 46 (2d Cir. 1987).......................................................................... 33

United States v. Elias,
    285 F.3d 183 (2d Cir. 2002)..................................................... 36, 40, 42

United States v. Estevez,
    961 F.3d 519 (2d Cir. 2020).......................................................... 47

United States v. Fabian,
    312 F.3d 550 (2d Cir. 2002).......................................................... 36

United States v. Ferguson,
    246 F.3d 129 (2d Cir. 2001).............................................. 31, 32, 33

United States v. Florez,
    447 F.3d 145 (2d Cir. 2006).......................................................... 29

United States v. Forbes,
    790 F.3d 403 (2d Cir. 2015).............................................. 33, 49, 50

United States v. Frampton,
    382 F.3d 213 (2d Cir. 2004).......................................................... 35

United States v. Gambino,
    59 F.3d 353 (2d Cir. 1995).................................................... 31, 33

United States v. Gershman,
    31 F.4th 80 (2d Cir. 2022)............................................................ 59

United States v. Gilbert,
    668 F.2d 94 (2d Cir. 1981)............................................................ 33

United States v. Gordils,
    982 F.2d 64 (2d Cir. 1992)................................................ 33, 49, 51, 53

United States v. Guadagna,
    183 F.3d 122 (2d Cir. 1999).......................................................... 29

United States v. Huezo,
    546 F.3d 174 (2d Cir. 2008).......................................................... 29

United States v. Hunter,
    32 F.4th 22 (2d Cir. 2022) ........................................................... 51

United States v. Imran,
    964 F.2d 1313 (2d Cir. 1992)........................................................ 33

United States v. Jackson,
    335 F.3d 170 (2d Cir. 2003).......................................................... 29

United States v. Jamison,
   299 F.3d 114 (2d Cir. 2002)..................................................................... 36, 37

United States v. Jones,
   30 F.3d 276 (2d Cir. 1994)................................................................ 37, 38, 42

United States v. Landesman,
   17 F.4th 298 (2d Cir. 2021) ...................................................................... 30, 32

United States v. Lee,
   834 F.3d 145 (2d Cir. 2016)...................................................................... 37, 38

United States v. Leslie,
   103 F.3d 1093 (2d Cir. 1997)........................................................................ 45

United States v. Lopez,
   514 U.S. 549 (1995)...................................................................................... 44

United States v. Lorenzo,
   534 F.3d 153 (2d Cir. 2008)......................................................................... 30

United States v. Mapp,
   170 F.3d 328 (2d Cir. 1999)......................................................................... 42

United States v. Mariani,
   725 F.2d 862 (2d Cir. 1984)......................................................................... 31

United States v. McCourty,
   562 F.3d 458 (2d Cir. 2009).................................................................... 31, 32

United States v. Mejia,
   545 F.3d 179 (2d Cir. 2008)......................................................................... 36

United States v. Newton,
   369 F.3d 659 (2d Cir. 2004)......................................................................... 59

United States v. Orelien,
   119 F.4th 217 (2d Cir. 2024) ............................................................. 37, 38, 45

United States v. Ortega,
   71 F. App'x 92 (2d Cir. 2003) ..................................................................... 39

United States v. Owen,
   500 F.3d 83 (2d Cir. 2007)........................................................................... 33

United States v. Pandrella,
   No. 22-CR-2712, 2024 WL 1506969 (2d Cir. Apr. 8, 2024) ............................. 38, 56

United States v. Parkes,
   497 F.3d 220 (2d Cir. 2007)......................................................................... 36

United States v. Perrotta,
   313 F.3d 33 (2d Cir. 2002)........................................................................... 38

United States v. Rainford,
   110 F.4th 455 (2d Cir. 2024) .................................................................. 59, 60

United States v. Reifler,
   446 F.3d 65 (2d Cir. 2006)........................................................................... 29

United States v. Rodriguez,
   392 F.3d 539 (2d Cir. 2004)........................................................................ 30

United States v. Rose,
   891 F.3d 82 (2d Cir. 2018)..................................................................... 37, 43

United States v. Rosenthal,
   9 F.3d 1016 (2d Cir. 1993).......................................................................... 29

United States v. Sanchez,
   969 F.2d 1409 (2d Cir. 1992)................................................................. 31, 32

United States v. Schiff,
   801 F.2d 108 (2d Cir. 1986)........................................................................ 46

United States v. Spencer,
   4 F.3d 115 (2d Cir. 1993)...................................................................... 52, 53

United States v. Spinelli,
   551 F.3d 159 (2d Cir. 2008)................................................................... 51, 52

United States v. Spinelli,
   No. 97-CR-209, 2007 WL 3231967 (E.D.N.Y. Oct. 30, 2007)......................... 34, 53

United States v. Suggs,
   14 F. Appx. 54 (2d Cir. 2001)..................................................................... 41

United States v. Temple,
   447 F.3d 130 (2d Cir. 2006)........................................................................ 30

United States v. Tocco,
   135 F.3d 116 (2d Cir. 1998)........................................................................ 59

United States v. Walker,
   974 F.3d 193 (2d Cir. 2020)........................................................................ 31

United States v. Wallach,
  935 F.2d 445 (2d Cir. 1991).................................................................. 55

United States v. Wexler,
  522 F.3d 194 (2d Cir. 2008).................................................................. 30

United States v. White,
  972 F.2d 16 (2d Cir. 1992).................................................................... 55

United States v. Wilkerson,
  361 F.3d 717 (2d Cir. 2004)..................................................... 38, 43, 44

United States v. Wong,
  78 F.3d 73 (2d Cir. 1996)....................................................................... 51

Weiler v. United States,
  323 U.S. 606 (1945)................................................................................ 35

Wickard v. Filburn,
  317 U.S. 111 (1942)................................................................................ 45

## STATUTES

18 U.S.C. § 922(g).............................................................. 25, 27, 45

18 U.S.C. § 924(c)...................................................................... 24, 26

18 U.S.C. § 924(j).............................................................................. 24

18 U.S.C. § 1001................................................................................ 27

18 U.S.C. § 1512...................................................................... 26, 27

18 U.S.C. § 1951(a)................................................................... 24, 36

## RULES

Fed. R. Crim. P. 29 ....................................................... 28, 29, 30, 55

Fed. R. Crim. P. 33 ...................................................................... passim

Fed. R. Evid. 104(a).......................................................................... 57

PRELIMINARY STATEMENT

As the jury found, the evidence at trial proved beyond a reasonable doubt that the defendants Charles Powell ("Powell"), Brian Castro ("Castro") and Musah Coward ("Coward") (collectively, the "Defendants"), conspired to commit and committed an armed robbery inside an illegal gambling spot located at 181 Hegeman Avenue in Brooklyn, New York (the "Gambling Spot"), during which they shot and killed Rodney Maxwell.  The Defendants now ask this Court to vacate the jury's verdict for two reasons: (1) insufficient evidence, and (2) evidence discovered after trial that cooperating witness Carlos Gomez arranged for others to shoot him in the leg to avoid testifying at trial.  Neither argument justifies the requested relief.

First, construed in the light most favorable to the government, the evidence fully supports the jury's verdict.  Indeed, the evidence of the Defendants' guilt was overwhelming and included, among other things, testimony from the Defendants' co-conspirator, Shamel Myhand ("Myhand"), who detailed the planning and commission of the robbery; video surveillance footage depicting Defendants Powell and Castro (and Myhand) as they entered the Gambling Spot and Powell and Castro as they shot Maxwell before fleeing; cell cite location data showing the Defendants' movements from New Jersey to the area of the Gambling Spot and back to New Jersey again after the robbery; and iCloud and social media evidence establishing the relationships between the Defendants and revealing that both Powell and Castro had a news article link covering the robbery saved in their respective iCloud accounts.  The government also presented an audio recording of Castro confessing to the robbery and shooting.  The Defendants' motions hardly address this evidence at all.  Instead, the Defendants largely rehash trial arguments that the jury was free to reject – namely, that the government failed to prove that money was stolen and that the robbery had an actual effect on interstate commerce.  But, as detailed below, the government presented sufficient evidence that money was stolen, including,

among other things, Myhand's testimony that he stole $1,200, Castro's own confession that the Defendants stole over $20,000 (the "Castro Confession"), and crime scene photographs and video showing not a single dollar left in the Gambling Spot after the robbery.  The government also proved that the robbery had at least a de minimis effect on interstate commerce through, among other things, Myhand's testimony that patrons purchased alcohol, including Heineken, at the establishment on occasion; crime scene photographs and video showing Heineken, Guinness and Casamigos in the Gambling Spot on the night of the robbery; testimony from representatives of Heineken USA and Diageo North America that Heineken, Guinness and Casamigos are brewed and bottled overseas; and evidence that the Gambling Spot shut down for roughly 48 hours after the robbery.

Second, the Court should not order a new trial on the basis of the evidence discovered after trial that Gomez arranged to be shot in his leg in order to avoid testifying at the Defendants' trial.  As discussed below, this newly discovered evidence related principally to the collateral matter of Gomez's own misconduct and had no substantive relevance to the subject matter of his testimony.  Gomez's credibility was heavily impeached at trial, and any additional impeachment would have been cumulative.  Notably, the government called Gomez as a witness to authenticate the recorded Castro Confession.  Gomez had no involvement in, or independent knowledge of, the charged offenses; and, although Gomez testified about how he knew each of the Defendants to provide context for the recording, this testimony was largely duplicative of evidence from the Defendants' own iCloud accounts that the government presented at trial. Thus, the overwhelming evidence of the Defendants' guilt came from independent evidence, not Gomez's testimony.  Thus, the Defendants' motions for an acquittal and a new trial should be denied, and they should proceed to sentencing.

2

I.   BACKGROUND

   A.   The Evidence at Trial

At trial, the government introduced overwhelming evidence that on the evening of October 7, 2020, the Defendants and co-conspirator Myhand carried out an armed robbery inside the Gambling Spot.  The evidence showed that Coward drove the Defendants from Paterson, New Jersey to Brooklyn where they picked up Myhand before driving to the Gambling Spot.  Coward waited in the car while Powell, Castro and Myhand entered and robbed the Gambling Spot.  Powell went to the backyard of the Gambling Spot and opened fire, sending patrons running for their lives. In addition, Powell and Castro each shot Rodney Maxwell, who was providing security for the Gambling Spot, causing his death.  Three additional victims were shot non-fatally – two were found in the backyard where Powell had opened fire, and the third was found on a nearby sidewalk.

As detailed below, the evidence presented to the jury included testimony from Myhand who explained that he and the Defendants decided to rob the Gambling Spot because they had robbed it before and, moments before committing the robbery, had heard that a patron had lost a substantial sum of cash that night.  Powell, Castro and Myhand entered the Gambling Spot and Myhand stole approximately $1,200 from a woman before getting into a scuffle with the security guard (Maxwell) over Myhand's firearm.  Video surveillance footage showed Powell, Castro and Myhand as they entered the Gambling Spot, Myhand's subsequent scuffle with Maxwell, and Castro and Powell as they shot Maxwell while fleeing.  Cell site location data showed the Defendants' phones traveling together from Paterson, New Jersey towards Brownsville, Brooklyn prior to the robbery, and their subsequent return to Paterson, New Jersey after the robbery was complete.  The government also presented substantial evidence from the Defendants' respective iCloud accounts showing the Defendants' relationships with one another and, in the case of Powell and Castro, their possession of a news link covering the robbery.  Other evidence included

3

testimony from a medical examiner who determined Maxwell's cause of death as gunshot wounds, expert testimony regarding the microscopic examination of discharged shell casings recovered from the scene, body-worn camera footage and crime scene photographs showing the inside of the Gambling Spot after the robbery, and testimony from representatives of Heineken USA and Diageo North America which established that Heineken beer, Guinness beer and Casamigos – all of which were depicted in crime scene photographs and footage after the robbery – are brewed and bottled overseas, including in October 2020.   In addition to this overwhelming evidence, the government presented the Castro Confession, in which Castro confessed to cooperating witness Carlos Gomez[1] that he and "Payback" (Powell) stole over $20,000 from a gambling business, and, before going inside the business, "Red" (Coward) gave Castro a firearm that Castro used to shoot the security guard.   Gomez authenticated the recording and provided context for its creation, including how he knew Castro and the other Defendants.

1.    The Plan to Rob the Gambling Spot

At trial, Myhand testified extensively about the lead-up to the robbery and the occurrences preceding the Defendants' choice to target the Gambling Spot.   Myhand explained that he robbed the Gambling Spot with Coward and two other individuals who he had not met before but later identified as Powell and Castro during trial.   Tr. 235:7-21, 237:5-8, 386:21-24, 387:9-11.

At the time of the robbery, Myhand and Coward had known each other for about 19 years—they met in Brownsville, Brooklyn when they were approximately 16-years-old and 14-years-old, respectively, Tr. 239:5-8, 245:13-15, 260:5-9; and Myhand knew members of Coward's

---

[1]    Pursuant to the Court's order, Gomez was permitted to testify under a pseudonym. See Tr. 1535:3-4.

family, including some of his brothers and cousins, Tr. 260:10-262:5.  Both Coward and Myhand

spent portions of their childhood growing up in Brownsville, Brooklyn, near the Gambling Spot,

before Coward moved to Paterson, New Jersey.  Tr. 237:9-14, 261:3-15.  At the time of the

robbery, Myhand was living in a shelter in Queens, New York, near JFK Airport.  Tr. 240:23-

241:4.  Over the years, Myhand and Coward had committed crimes together, including armed

robberies, and Myhand sold drugs for Coward. Tr. 244:17-23, 266:12-17, 276:8-10.  One such

robbery occurred at the Gambling Spot the year prior to the murder of Maxwell on October 7,

2020, during which Myhand and Coward, who were both armed, stole approximately $300,

according to Myhand.  Tr. 360:23-361:23, 365:3-367:6.

Prior to the day of the robbery, Myhand had been to the Gambling Spot "about ten

times." Tr. 367:7-12.  He described the layout as consisting of a front room "with a lot of junk[,]"

followed by a second room that was "like a kitchen area where they [sold] weed and . . .  alcohol

beverages," a third room with a pool table "where everything [took] place," and a backyard.  Tr.

367:13-24. On past visits, Myhand played "Cee-lo," which is a dice game where people place bets

that were kept on the pool table, and pool; Myhand testified that he saw people betting between $1

and $30,000 on pool games.  Tr. 368:15-371:23, 410:14-411:3.  According to Myhand, to enter

the Gambling Spot, a person would have to get invited with a phone call or text message.  Tr.

372:4-14.  The Gambling Spot sold alcoholic beverages in the second room such as beer, including

Heineken beer for $3-4, and liquor, including vodka.  Tr. 372:15-24.  Myhand had purchased, and

observed others purchasing, Heineken; and he had also bought marijuana there.  Tr. 409:24-410:7,

411:4-9.

On the day of the robbery, Coward called Myhand several times to discuss finding

a place to rob and eventually told Myhand to meet him at the corner of Dean and Saratoga Street

in Brooklyn. Tr. 342:18-343:9. Coward picked up Myhand in a black Honda Civic and Myhand observed two other individuals in the car. Tr. 343:10-20, 351:1-2. One of the individuals had "long dreads" and the other individual was "stocky." Tr. 351:19-24. After he got in the car, Coward said he "may have a guy inside the spot right now[,]" but he was not sure where and was going to see what the person was going to say when he came out of the spot as to whether it was lit—i.e., crowded; meanwhile, he (Coward) was going to drive around to other spots to see if they were open. Tr. 357:23-359:2.

Coward drove them to Brownsville near the corner of Mother Gaston and Lott Avenue. Tr. 343:10-20. While in Coward's car, an individual named "Day Day," who Myhand knew was Coward's cousin, walked up on foot. Tr. 343:15-344:12. Coward asked Day Day where he had been, and Day Day responded that "he just came from the gambling spot and that a person just lost 50,000 in the spot and came back with another 20,000."[2] Tr. 344:2-5. Coward then told Day Day that they were "going to rob the spot," to which Day Day laughed and asked how they planned to do that without masks when people at the spot knew Coward and Myhand. Tr. 344:6-12.

After the conversation with Day Day, Coward circled the Gambling Spot located on Hegeman Avenue between Osborn Avenue and Watkins Street to see if it was open. Tr. 359:15-360:1. They saw a person go inside but, according to Myhand, because they knew that the Gambling Spot also sold weed, they drove around and continued to watch if more people went inside. Tr. 360:5-10. Once they saw a few more people enter the Gambling Spot, they "realized

---

[2]    During trial, the Court instructed the jury that Myhand's testimony concerning Day Day's statements was only admissible for the limited purpose of explaining what Myhand and his co-conspirators did in response to hearing the statements – not for the truth that someone did, in fact, lose $50,000. Tr. 350:2-19.

it was open" for gambling, and they stopped on Osborn Avenue between Linden Boulevard and

Hegeman Avenue where Myhand and the two other individuals got out of the car.  Tr. 360:2-16.

Myhand told Coward that he did not think it was a good idea to rob the spot since they had robbed

it the year prior, and Coward told him that "tonight [was] the night" because it was "lit"; because

he (Coward) had brought two extra people; and because Myhand did not have to do much except

see who was inside and how much money was being played and "stuff" the door, meaning make

sure it was not locked.  Tr. 373:8-21.  Coward then asked Myhand if he had a firearm and, after

Myhand said no, Coward gave a loaded silver revolver to Myhand.  Tr. 373:22-374:10.  Myhand

then started walking to the Gambling Spot.

Myhand's testimony was corroborated by several pieces of evidence, including

phone records, cell site location data, license plate reader ("LPR") hits, surveillance video, crime

scene photographs and body-worn camera footage of the inside of the Gambling Spot, and text

messages between the Defendants.  See, e.g., GX 30, 51-56, 81-2, 200-204, 300, 414-419, 708-4-

R-V2, 806-815.  Specifically, the government presented cell site location data for the three

Defendants' phones showing them assembled in the same general area in Paterson, New Jersey on

the evening of robbery.  GX 30.  The cell site data roughly coincided with LPR hits for a black

Honda Civic (the "Civic"), which the government established at trial that Coward used as his own,[3]

as the Civic traveled toward Brooklyn.  GX 806-815.  Cell site location activity for Powell and

---

[3]        Evidence at trial established that the Civic was registered to Maxine A. Wallace, under New Jersey license plate N50LJP with an associated address of 319 Park Avenue in Paterson, New Jersey.  GX 1014.  The government also presented evidence that law enforcement officers stopped Coward while he was driving the Civic in March 2020, during which Coward's address was verified as 319 Park Avenue, Paterson, New Jersey, and that Coward was in a relationship with someone named Maxine.  Tr. 720:14, 326:9-13; GX 420D.  Further, certified records from Block Inc. for Coward's account listed 319 Park Avenue in Paterson as one of the addresses.  GX 1008-2.

Coward showed their movement from Paterson, New Jersey, to New York City, and then south towards Brooklyn, including near the corner of Dean and Saratoga Street where Myhand testified Coward picked him up.  GX 30.  Phone records also established that Coward had called Myhand several times on the day of the robbery, consistent with Myhand's testimony.  GX 204.

The government also presented video surveillance footage collected from inside and around the general vicinity of the Gambling Spot.  GX 51, 81-2.  Video surveillance from a location near the Gambling Spot captured the Civic parking around the corner from the Gambling Spot approximately twenty minutes before the robbery.  It then showed Castro, Powell and Myhand standing around the Civic before walking around the corner toward the Gambling Spot in a single-file line led by Powell, followed by Castro, and finally by Myhand.[4]

Myhand's description of the layout of the Gambling Spot was consistent with crime scene photographs and body-worn camera footage taken from first responders to the scene which showed a front room that was full of "junk"; a second room with food, drinks, and a refrigerator, resembling a kitchen; a third room with a pool table and other gambling instruments; and a backyard.  Tr. 367:13-24; GX 300 (body-worn camera footage); GX 416-5 (showing Heineken, refrigerator, snacks); GX 416-4 (showing Heineken, Guinness, and bottles of liquor, including Casamigos).

---

[4]    The government presented extensive evidence from Powell and Castro's iCloud accounts and social media accounts, which showed their faces, clothing and distinctive tattoos, to establish that they were the individuals captured on the video surveillance.  For example, the government presented photographs of Powell from his phone showing a distinctive heart-shaped tattoo under his right eye, consistent with a heart-shaped tattoo under the right-eye of the first individual who walked into the Gambling Spot.  GX 713A-31, 713A-36.  The government also presented photographs of Castro with distinctive dreadlocks and a stature consistent with the second individual who walked into the Gambling Spot.  GX 613A-3, 613A-21.  In addition to photographs from iCloud accounts, the government presented photographs of Powell taken pursuant to a search warrant after his arrest, further depicting his distinctive face tattoos.  GX 400-406.

Evidence from the Defendants' iCloud accounts, including text messages between the Defendants, was consistent with them traveling to New York on the day of the robbery. Specifically, there were text messages between Powell and Coward about a "lick"—which Gomez testified is a robbery, see Tr. 1560:4-5—in New York.  GX 708-4-R-V2.

2.     The Robbery of the Gambling Spot and the Murder of Rodney Maxwell

Myhand testified about what happened once he and the other two individuals – Powell and Castro – entered the Gambling Spot.  After entering, Myhand walked to the door of the second room and the security guard searched him and found the firearm.  Tr. 374:24-375:10. The two got into an argument during which Myhand looked into the back room and saw numerous people.  Tr. 375:11-14, 376:1-4.  The security guard told Myhand to take off his mask, which he did for a few seconds, and then "a woman came from the back and asked what's the situation," to which Myhand responded "nothing."  Tr. 376:6-22.  The woman asked Myhand if he received a link or if someone let him know about the night and asked to see the link on his phone.  Tr. 376:23-377:5.  Myhand pulled out the firearm, pointed it at the security guard, and told him and the woman not to move because he was just looking to rob the place and leave.  Tr. 377:2-15.  Myhand then noticed that the woman who questioned him had money in her hand and he ordered her to put it in his pocket.  Tr. 377:25-378:4.  When she refused, Myhand "grabbed the money out of her hand and put it in [his] own pocket."  Tr. 378:2-5.   Myhand stole approximately $1,200 from the woman.  Tr. 391:3-9, 399:10-11.  Myhand and the security guard then began fighting over the firearm, starting near the second room and progressing into the front room in view of the camera, at which point Myhand's firearm went off.  Tr. 378:3-380:2.  During the altercation, Myhand saw someone approach them and fire a gun, which hit Maxwell's chest.  Tr. 384:2-14.  Maxwell then

9

fell to the ground, and Myhand fled on foot up Osborn Avenue after seeing that the others had left him behind.  Tr. 385:2-21, 386:7-8, 389:14-16.

Video surveillance footage from inside the Gambling Spot was largely consistent with Myhand's account.  See GX 81-2.  Powell, Castro and Myhand were depicted walking from Coward's car into the Gambling Spot.  All three walked through the front room, where video cameras were pointed, and into the second room which was out of view of the surveillance cameras.  Approximately one minute later, Myhand and Maxwell entered into view of the camera in the front room.  They were in a scuffle, and a silver firearm was in Myhand's hand, consistent with testimony from Myhand that Coward had given him a silver revolver and that he got into a struggle with the security guard because Myhand had a gun.  Moments later, Castro came into view, ran behind Maxwell, shot him in the back, and fled the Gambling Spot.  Around the same time, Powell was depicted on video in the backyard shooting multiple times into a crowd as people ran for their lives.  Powell then went to the front room where he was captured on video shooting Maxwell in the chest before leaving.  Video surveillance footage from outside the Gambling Spot depicted Castro and Powell as they ran back to the Civic immediately after shooting Maxwell, and the Civic driving away.  Meanwhile, Maxwell had fallen to the ground after the second shot and Myhand struggled to open the door to exit, which he eventually did before fleeing.  Id.

Maxwell was pronounced dead shortly after the shooting.  Tr. 73:4-12, 97:14-25. A medical examiner who performed Maxwell's autopsy testified that he sustained two gunshot wounds—one that entered through his chest and a second that entered through his back—and that the presence of fowling and stippling around the wounds indicated that the gunshots were discharged from close range.  Tr.  1050:21-25, 1059:19-1060:12, 1068:7-25.  The medical examiner concluded that the cause of Maxwell's death was gunshot wounds to the torso and that

10

either gunshot wound would have killed him independently.  Tr. 1073:15-19.   The locations of the wounds on Maxwell's torso were consistent with the video surveillance footage showing where Castro and Powell shot Maxwell before fleeing.

The government presented evidence that four cartridge casings were recovered in the Gambling Spot after the robbery.  Detective Constantina Deluca, who processed the crime scene two days after the robbery, testified that a discharged bullet and two shell casings – one 9mm and one .380 caliber – were recovered from the front room by the entrance, one .380 caliber cartridge casing was recovered in the back room, and another .380 cartridge casing was recovered in the backyard.  Tr. 165:25-166:7, 178:20-179:1, 180:4-6, 182:16-20; see also Tr. 86:16-21.  The locations of the cartridge casings recovered in the front room are consistent with where Castro and Powell were standing (as captured on video surveillance) when they shot Maxwell, and the recovery of a cartridge casing in the backyard is consistent with the video showing Powell shooting in the backyard.   Additionally, the government presented testimony from ballistics expert Detective Robert Bustamante who analyzed the four recovered cartridge casings and concluded that the two .380 casings recovered in the back room and backyard were fired by the same firearm, Tr. 765:4-766:4, which is also consistent with the video surveillance of Powell shooting multiple rounds in the backyard.

Myhand testified that, after fleeing, he went to the shelter in Queens near JFK Airport where he was staying, hid the gun Coward had given him, and had a friend bring him clothes to change into because he had Maxwell's blood on him.  Tr. 392:7-393:18, 394:15-395:19.  Myhand then called his own phone, which he had left in Coward's car before the robbery, and Coward eventually picked up and agreed to drive to the shelter and drop off the phone.  Tr. 393:21-394:6, 396:18-397:9.  When Coward arrived, Myhand returned the firearm that Coward had given

him and walked with Coward to his car on the North Conduit side of the highway, where the other two individuals were waiting.  Tr. 398:1-25.  After telling them that he had only stolen $800 because they left him behind, Myhand gave them $600 and left.  Tr. 399:1-11.  Cell site location data for Powell's phone was consistent with Myhand's testimony that after the robbery the Defendants traveled to the North Conduit side of the highway near JFK.  GX 30.

### 3.    The Aftermath of the Robbery and the Castro Confession

After the robbery, the Gambling Spot was immediately shut down as first responders rushed to the scene to treat Maxwell.  GX 300; Tr. 84:3-10.  Medical assistance was also rendered to three other individuals who had also been shot non-fatally.  Tr. 85:15-86:3.  NYPD officers secured the crime scene with black and yellow police tape and also by posting police officers to the crime scene.  Detective Deluca testified that when she arrived at the scene at approximately 5:50 p.m. on October 9, 2020, the scene was still secured.  Tr. 143:19-144:22.  Detective Deluca also testified that she took photographs of the crime scene, which the government introduced into evidence.  Tr. 141:7-11, 146:4-13; see also GX 414-419.  The photographs of the back room depicted a large pool table in the middle of the room along with a smaller table on the side of the room with dominoes and playing cards on it.  GX 426-21, 417-11, 417-12.  A photograph of the back room also depicted a Heineken bottle on the bathroom sink.  GX 426-21.  Photographs of the second room depicted a refrigerator, individually-packaged snack food items, and boxes of beer including Heineken and Guinness.  GX 416-3, 416-4, 416-5, 416-9.

About a week after the robbery, on October 15, 2020, ABC Eyewitness News (WABC-TV) ran a news video reporting on the robbery and the death of Maxwell (the "ABC News Video").  GX 1022B-1.  The government introduced redacted portions of the news video into evidence, which showed a clip of the video surveillance showing Powell, Castro and Myhand as they walked into the Gambling Spot and the reporter imploring the public to dial into a hotline

with any information.  GX 1022A-R.  The government presented evidence that both Castro and Powell had accessed the ABC News Video.  Specifically, located in Castro's iCloud account were messages sent on October 16, 2020—the day after the ABC News Video aired—in which Castro sent his girlfriend a link to the video and stated that he had to "start laying low" and could not "make no noise not even a ticket."  GX 608-13.1.  Powell also had portions of the ABC News Video saved on his phone.  GX 714A-27-R.

Approximately one month after the robbery, Castro bragged to a friend, Carlos Gomez, about his involvement.  Gomez testified at trial as a cooperating witness about his conversations with Castro, one of which was recorded.[5]  Specifically, Gomez testified that at the time of the recorded discussion, he was working with the Federal Bureau of Investigation ("FBI") as a confidential source.  Tr. 1539:11-16.  As part of this effort, the FBI gave Gomez a cell phone and instructed him to record any evidence of criminal activity.  Tr. 1539:24-1540:7.

Gomez testified that in November 2020, he was at a barbershop in Paterson, New Jersey when Castro told Gomez and a few others that Castro committed a robbery at a gambling spot in Brooklyn.  Tr. 1555:3-1556:1.  During the discussion, Castro showed them a news video about the robbery on Castro's phone, and Gomez recognized Castro in the video.  Tr. 1556:2-17. After the discussion, Gomez initiated another meeting with Castro to get more details about the robbery which Gomez recorded – the Castro Confession.  Tr. 1557:6-13.  The government introduced into evidence the recording and a transcript, which included Spanish translations where needed.  GX 251-R, 251-T.  In the Castro Confession, Castro boasted about how he and others,

---

[5]       In January 2021, Gomez pleaded guilty in the District of New Jersey to an Information charging him with six counts of distribution of controlled substances, including alprazolam, cocaine and heroin, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(2) and (b)(1)(C), pursuant to a cooperation agreement.  See Tr. 1583:24-1584:9.

including "Payback," each of whom were armed, went to a crowded "gambling spot" to do a "lick" in which they robbed the people inside, at gunpoint, of over $20,000.[6]  GX 251-R.  Castro stated that the security guard at the gambling spot, who was large in size, got into a fight with one of the "homies" and struggled to disarm the "homie" of his "strap."  Castro noticed this and shot the security guard as the security guard was fighting with the "homie."  Castro stated that his gun, which "Red" (Coward) had given him, jammed after Castro fired it.  Castro also added that "Red" later sold that firearm.  Castro also stated in the Castro Confession that "Payback" (Powell) fired multiple shots while they were inside the Gambling Spot.  Castro told Gomez that his cut of the robbery was five "bands" and eight hundred ($5,800).  Id.

      To provide context for his conversations with Castro, Gomez also testified about his relationship with Castro and the fact that they often hung out at a gas station around 23rd and Park Avenue in Paterson, New Jersey (the "Gas Station") as Castro sold drugs.  Tr. 1537:25-1538:13, 1543:17-1544:6.  Gomez also testified that he knew "Red" and "Payback," who he identified in court as Coward and Powell, respectively, from hanging out at the Gas Station, and that Castro, Red and Payback all hung out and sold drugs at the Gas Station.  Tr. 1549:25-1551:8, 1553:5-20, 1578:11.[7]

---

[6]     Gomez testified about his understanding of certain terms used by Castro during the discussion, including: "lick," which means robbery; "strap," which means gun; and "band," which means one thousand.  Tr. 1560:4-11.  He also identified defendant Coward as "Red," and defendant Powell as "Payback" during his testimony.  Tr. 1549:10-1555:1.

[7]     Pursuant to the Court's ruling precluding evidence of the Defendants' gang affiliation, see Tr. 258:1-7, the government did not elicit any testimony at trial regarding the Defendants' gang affiliation, contrary to defendant Coward's motion, see Coward Mot. at 2 (ECF No. 329).

4.    The Relationships Between the Defendants

In addition to the evidence detailed above, the government also presented independent evidence of the relationships between the Defendants through, among other things, iCloud and social media evidence. For example, the government presented evidence that the Defendants had each other's phone numbers saved as contacts and messaged each other. GX 507, 508-20, 607, 608-6-R, 707, 708-3-R, 708-4-R-V2. There were also social media photographs in which the Defendants engaged with each other, including Coward "liking" and commenting on Castro's posts. GX 613A-31, 613A-16, 613A-18. The government also presented multiple photographs of each of the Defendants individually hanging out at the Gas Station and messages with other people discussing meeting there. GX 425B, 425C, 613A-3, 613A-7, 713A-16, 713A-40, 508-17.1 ("come to park ave [gas pump emoji]"), GX 508-5.1 (providing meeting address of "310 Park Avenue," which is the Gas Station).

Some of the conversations among the Defendants showed that they had a relationship of trust and turned to each other for firearms, ammunition, or to talk about robberies. For example, the government presented text messages sent from Powell to Coward asking for ammunition and trying to find a "lick." GX 708-4-R-V2, 708-3-R. The government also introduced messages sent from Castro to Coward asking for a firearm and talking about committing robberies. GX 508-20, 608-6-R.

B.    The Jury's Verdict

On January 30, 2025, after a few hours of deliberations, the jury returned a verdict of guilty on all counts against each of the defendants, i.e., (1) Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a) (Count One); (2) Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count Two); (3) possessing, brandishing, and discharging firearms during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i)-(iii) (Count Three); (4) causing death through

15

the use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(j) (Count Four);

and (5) possession of ammunition after a previous felony conviction, in violation of 18 U.S.C.

§ 922(g) (Count Five), as to defendant Charles Powell.  See S-1 Indictment (ECF No. 78); Verdict

Form (ECF No. 297).

      C.    <u>Post-Trial Evidence of Carlos Gomez's Involvement in His Own Shooting</u>

      In the early morning hours of January 15, 2025—the day the parties delivered

opening statements—the government learned that Gomez had been shot in the leg (the "Gomez

Shooting").  Later that morning, prior to opening statements, the government submitted a sealed

letter to the Court and the Defendants disclosing that Gomez advised law enforcement that he

had been approached by masked men while in Manhattan, one of whom stated in sum and

substance, "you better keep your mouth shut, you rat," and Gomez was shot in the leg after the

threat was made.  <u>See</u> January 15, 2025 Letter (ECF No. 245) (the "January Letter").  Trial

commenced that day and law enforcement agents launched an independent investigation into the

incident.

      On January 27, 2025, the government notified the Court and the Defendants that

Gomez would be called to testify in person at trial.  Tr. 1504:15-17.  During a colloquy made

outside the presence of the jury, defense counsel requested confirmation that the government did

not seek to elicit testimony about the Gomez Shooting.  Specifically, counsel for defendant

Coward stated: "Your Honor, we're assuming that the Government is not going to be permitted

to elicit testimony about the shooting."  Tr. 1508:10-12.  In response, the government stated,

"No, Your Honor. We do not intend to elicit testimony about the shooting, but if the door is

opened, the witness will be prepared to testify truthfully."  Tr. 1508:13-15.  Shortly after, counsel

for Castro stated, "Judge, maybe the more important subject is whether the testimony is going to

cover [Gomez's] condition and why he's in that condition and the circumstances of it."  Tr.

16

1509:9-11.  In response, the Court stated: "I don't think -- nobody has asked about that and the Government surely would have moved <u>in</u> <u>limine</u> if that was their intention," to which counsel for Castro stated: "Okay. So I see the Government nodding. So they are representing that is true." Tr. 1509:13-17.  Later that evening, in an email dated January 27, 2025, the government by e-mail disclosed to the Defendants that Gomez advised law enforcement that he purchased and smoked marijuana on the night of the Gomez Shooting.  <u>See</u> Tr. 1525:17-22.

   The next day, on January 28, 2025, Gomez testified at trial.  Gomez testified primarily about his past criminal conduct and drug use, Tr. 1582:7-1583:9, 1618:24-1622:21, 1631:21-1634:12; his cooperation with the government and work with the FBI, 1583:10-1588:7, 1604:24-1607:2, 1611:10-1613:9; the circumstances around Castro's confessions to the robbery and the recording (the Castro Confession), Tr. 1555:3-1563:14, 1571:13-1576:3, 1607:2-1611:9; and how Gomez knew each of the Defendants, which largely centered around hanging out near the Gas Station where the Defendants sold drugs together, Tr. 1543:17-1544:6 ("Morenaje" (Castro) selling drugs at the Gas Station); Tr. 1550:14-1551:8 ("Red" (Coward) selling drugs at the Gas Station); Tr. 1553:5-22 ("Payback" (Powell) selling drugs at the Gas Station); Tr. 1578:5-11 (Defendants hanging out and selling drugs together at the Gas Station).  Gomez did not testify about—and was not asked any questions about—the circumstances of the Gomez Shooting other than the fact that Gomez had purchased marijuana within the same month as his testimony.  On February 7, 2025, about a week after the verdict, two individuals were arrested in connection with the Gomez Shooting pursuant to an arrest warrant and complaint which issued on February 5, 2025, charging each with violations of 18 U.S.C. §§ 1512 (witness tampering) and 924(c) (possession, use and brandishing of firearms in furtherance of a crime of violence). <u>See</u> Magistrate Docket No. 25-36.  Following their arrests, on February 7, 2025, the individuals

17

were informed of and agreed to waive their <u>Miranda</u> rights, and informed law enforcement agents, in sum and substance and in part, that Gomez organized the shooting in an effort to avoid testifying at the trial.[8]  On the same day, the government notified the Court about these statements through an <u>ex parte</u> letter and asked for permission to delay disclosure to the Defendants until the government obtained a clearer understanding of the veracity of the claims through its continued investigation.  <u>See</u> February 7, 2025 Letter ("February 7 Letter") (ECF No. 300).

On February 11, 2025, the Court scheduled an emergency <u>ex parte</u> telephone conference with the government to address the February 7 Letter.  The conference was held the next day, on February 12, 2025.  During the conference, the Court ordered the government to make its disclosure to the Defendants by March 3, 2025.

On February 20, 2025, the government filed a letter under seal[9] notifying the Defendants about the arrests and statements of the two individuals involved in the Gomez Shooting (the "February 20 Letter") (ECF No. 307).

___

[8]    Gomez and both individuals pleaded guilty to offenses arising from their involvement in the Gomez Shooting.  Specifically, on March 18, 2025, Gomez pleaded guilty to conspiracy to tamper with witnesses, in violation of 18 U.S.C. § 1512(k), and making material false statements, in violation of 18 U.S.C. § 1001.  On May 22, 2025, one of the individuals pleaded guilty to conspiracy to tamper with witnesses, in violation of 18 U.S.C. § 1512(k).  On June 12, 2025, the second individual pleaded guilty to conspiracy to tamper with witnesses, in violation of 18 U.S.C. § 1512(k), and possessing a firearm after a prior felony conviction, in violation of 18 U.S.C. § 922(g)(1).

[9]    On June 20, 2025, the government moved for an order unsealing the February 20 Letter, which the Court granted on July 7, 2025.  <u>See</u> ECF Nos. 333, 334.  Accordingly, Coward's motion for unsealing should be denied as moot.  <u>See</u> Coward Mot. at 6-8 (ECF No. 329).

On March 21, 2025, the government filed a supplemental disclosure letter notifying the Defendants that the government and the FBI provided additional funds to Gomez for temporary relocation after trial and enclosing communications from Gomez's phone (the "March 21 Letter") (ECF No. 311).

## II.  THE DEFENDANTS' MOTIONS SHOULD BE DENIED

The Defendants seek to vacate their convictions or, in the alternative, a new trial because they assert that the evidence against them was legally insufficient and because of evidence concerning cooperating witness Gomez's participation in his own shooting that was discovered after trial.  See Castro Rule 29 Motion (ECF Nos. 290, 295); Coward Rule 29 Motion (ECF No. 291); Powell Rule 29 Motion (ECF No. 328); Coward Rule 33 Motion (ECF No. 329); Coward Renewed Rule 29 Motion (ECF No. 330); Powell Rule 33 Motion (ECF No. 331).[10]

The Defendants' arguments do not clear the high bar required to grant a judgment of acquittal or a new trial.  As the jury found and as recounted above, the evidence against the Defendants was clear and overwhelming, including on the two principal issues that the Defendants challenge in their Rule 29 motions—whether a robbery occurred and, if so, whether such robbery affected interstate commerce.  Furthermore, the evidence of Gomez's involvement in his own shooting, which was discovered after trial, does not require a new trial because it was related principally to the collateral matter of Gomez's own misconduct and was not material to the verdict.

### A.    Legal Standards

#### 1.    Rule 29

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence

---

[10]    The government presumes that the Defendants each join in the motions of the other Defendants.  See Coward Mot. at 2.

is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  As the Second Circuit has

instructed:

> In challenging the sufficiency of the evidence to support his
> conviction, a defendant bears a heavy burden.  In considering such
> a challenge, we must credit every inference that could have been
> drawn in the government's favor and affirm the conviction so long
> as, from the inferences reasonably drawn, the jury might fairly have
> concluded guilt beyond a reasonable doubt.  We defer to the jury's
> determination of the weight of the evidence and the credibility of the
> witnesses, and to the jury's choice of the competing inferences that
> can be drawn from the evidence.  Pieces of evidence must be viewed
> not in isolation but in conjunction, and the conviction must be
> upheld if any rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.

United States v. Reifler, 446 F.3d 65, 94-95 (2d Cir. 2006) (citations and internal quotation marks

omitted); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) ("Under Rule 29, a

district court will grant a motion to enter a judgment of acquittal on grounds of insufficient

evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond

a reasonable doubt"); United States v. Florez, 447 F.3d 145, 154 (2d Cir. 2006); United States v.

Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993).

In resolving a Rule 29 motion, a court "must be careful to avoid usurping the role

of the jury."  United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000); see also Florez, 447 F.3d

at 155 ("[i]n assessing sufficiency" of the evidence in connection with a Rule 29 motion, courts

must be "mindful that the task of choosing among permissible competing inferences is for the jury,

not a reviewing court").  As the Second Circuit has explained, "jurors are entitled, and routinely

encouraged, to rely on their common sense and experience in drawing inferences."  United States

v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008).  The Second Circuit has also made clear that trial

courts may "enter a judgment of acquittal only if the evidence that the defendant committed the

crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a

reasonable doubt." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted); see also United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant a Rule 29 motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)).

Even if the Court concludes that the jury could have acquitted a defendant, the Court may not disturb the jury's verdict on that ground because, "[w]here a court concludes after a full analysis of the evidence in connection with a Rule 29 motion that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." United States v. Temple, 447 F.3d 130, 137 (2d Cir. 2006) (citations and internal quotation marks omitted).

As the Second Circuit explained recently, this "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy." United States v. Landesman, 17 F.4th 298, 320 (2d Cir. 2021). "'This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" Id. (quoting United States v. Anderson, 747 F.3d 51, 73 (2d Cir. 2014)). "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'" Id. (quoting United States v. Wexler, 522 F.3d 194, 207-08 (2d Cir.

2008)).  "Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'"  Id. (quoting United States v. Mariani, 725 F.2d 862, 865-66 (2d Cir. 1984)).

    2.   Rule 33

        a.   Generally

Federal Rule of Criminal Procedure 33 permits a court, upon motion by the defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Ordering a new trial is an extraordinary remedy that is "disfavored in this Circuit," and, as a result, "the standard for granting such a motion is strict."  United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995); see also United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (a district court "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances") (internal quotation marks omitted) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)).

"In determining whether to grant a Rule 33 motion, the ultimate test is whether letting a guilty verdict stand would be a manifest injustice."  United States v. Walker, 974 F.3d 193, 208 (2d Cir. 2020) (citations and internal quotation marks omitted).  "A court must have a real concern that an innocent person may have been convicted."  Id. (quoting United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005)); United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (same); Ferguson, 246 F.3d at 134 (same); Sanchez, 969 F.2d at 1414 (same).  "The defendant bears the [heavy] burden of proving that he is entitled to a new trial under Rule 33."  McCourty, 562 F.3d at 475.  "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  Id. (quoting Sanchez, 969 F.2d at 1414).

The Second Circuit on several occasions has reaffirmed that "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (quoting Sanchez, 969 F.2d at 1414); see also Landesman, 17 F.4th at 330-31 (same).   In both Archer and Landesman—neither of which are cited by the Defendants' motion—the Second Circuit reversed a district court's decision to grant a Rule 33 motion, concluding in each case that the district court had improperly usurped the role of the jury in weighing the evidence and inferences drawn from that evidence.   The Court provided the following explanation of the "preponderates heavily" standard in Landesman:

> Under the "preponderates heavily" standard, which was first articulated in Sanchez and later applied in Archer, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Archer, 977 F.3d at 188 (internal quotation marks omitted).   "To the contrary, absent a situation in which," for example, "the evidence was 'patently incredible or defie[d] physical realities,' . . . where an evidentiary or instructional error compromised the reliability of the verdict," id. (internal citation omitted) (quoting Ferguson, 246 F.3d at 134), or where the government's case depends upon strained inferences drawn from uncorroborated testimony, "a district court must 'defer to the jury's resolution of conflicting evidence.'" Id. (quoting McCourty, 562 F.3d at 475-76); see also Ferguson, 246 F.3d at 136-37 (affirming district court's grant of Rule 33 motion where, among other things, there was no evidence that the defendant participated in the gang's activities and the only evidence supporting his gang membership was the speculative testimony of one of the government's witnesses).
>
> . . .
>
> Moreover, in applying the "preponderates heavily" standard, a district court "must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." Archer, 977 F.3d at 189; see also Sanchez, 969 F.2d at 1414 (explaining that when considering whether sufficient evidence "supports the jury's finding that th[e] defendant is guilty beyond a reasonable doubt," the district

court must objectively "examine the totality of the case," taking "[a]ll the facts and circumstances" into account (internal quotation marks omitted)).

17 F.4th at 331.

        b.    <u>Newly Discovered Evidence</u>

Likewise, when "determining whether to grant a retrial on the ground of newly discovered evidence," under Rule 33, a "district court must exercise 'great caution'" and may do so "only 'in the most extraordinary circumstances.'" <u>United States v. Imran</u>, 964 F.2d 1313, 1318 (2d Cir. 1992) (quoting <u>United States v. DiPaolo</u>, 835 F.2d 46, 49 (2d Cir. 1987)); <u>see also</u> <u>Ferguson</u>, 246 F.3d at 134 (a district court "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances") (citations and internal quotation marks omitted).  As a result, "the standard for granting such a motion is strict."  <u>Gambino</u>, 59 F.3d at 364.

"Relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that '(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.'" <u>United States v. Forbes</u>, 790 F.3d 403, 406-07 (2d Cir. 2015) (citing <u>United States v. Owen</u>, 500 F.3d 83, 88 (2d Cir. 2007) (citing decisions from the Third, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits)); <u>see also</u> <u>Gambino</u>, 59 F.3d at 364 ("Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict"); <u>see also</u> <u>United States v. Gilbert</u>, 668 F.2d 94, 96 (2d Cir. 1981) ("This Circuit's standard for granting Rule 33 motions is clear . . . the new evidence must be such that it would probably lead to an acquittal"); <u>see also</u> <u>United States v. Gordils</u>, 982 F.2d 64, 72 (2d Cir. 1992) ("Newly discovered evidence does not warrant a new trial unless the evidence is so material and

non-cumulative that its admission would probably lead to an acquittal.") (citations and internal quotation marks omitted); United States v. Spinelli, No. 97-CR-209, 2007 WL 3231967, at *5 (E.D.N.Y. Oct. 30, 2007) (providing that "evidence that is cumulative is not material").

      B.      <u>The Evidence Proved the Defendants' Guilt Beyond a Reasonable Doubt</u>

            1.     <u>The Evidence Proved that a Robbery Occurred</u>

The Defendants argue that "the only evidence of a robbery" was "Myhand's claim that he took money," and that his testimony was insufficient to establish that a robbery actually occurred because it was "uncorroborated, vague, and unsupported by any physical or circumstantial evidence." Powell Rule 29 Mot. at 10-11 (ECF No. 328). These arguments are meritless. Myhand's testimony regarding the circumstances surrounding the robbery was corroborated in multiple ways and the jury was entitled to credit his testimony. For example, Myhand's testimony about fighting with the security guard was corroborated by video surveillance depicting the struggle and Castro's own account of the robbery in the Castro Confession, including his description of the fight between "the homie" (Myhand) and the security guard and Castro shooting the guard before he fled. Myhand's testimony that a woman was "running control" of the Gambling Spot that night, Tr. 376:6-377:5, 382:12-18, was also corroborated by Castro's statement that the sister of the owner was there. The cell site location data was also consistent with Myhand's testimony that the Defendants picked him up in Brooklyn, drove to the Gambling Spot, and drove to Myhand's shelter after the robbery to retrieve the firearm used in the robbery. In sum, Myhand's testimony was amply corroborated by multiple forms of evidence and a rational jury could have credited his testimony about taking the money.

Further, it is simply not true that Myhand's testimony was the only evidence of a robbery.[11]  Castro stated—in his own words—that the Defendants stole over $20,000 that night.[12]  Additionally, video surveillance showed multiple people fleeing for their lives in the backyard as Powell shot at them, showing that patrons had been in the Gambling Spot when Powell, Castro and Myhand went inside.  The government also presented crime scene photographs and videos showing that, despite numerous patrons having been inside minutes earlier, not a single dollar was left on the gambling tables after the robbery, further supporting an inference that the Defendants stole money.

2.    The Evidence Proved an Effect on Interstate Commerce

The Defendants next argue that the government failed to prove that the Defendants' robbery had an effect on interstate commerce, as required to support Hobbs Act robbery and Hobbs Act robbery conspiracy convictions.  Powell Rule 29 Mot. at 1-9 (ECF No. 328); Castro Rule 29

---

[11]    Even if it were, Myhand's testimony alone was sufficient to support the conviction.  See United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) ("We note . . . that the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction, and that such a principle has deep roots in our system of justice.") (additional citations and internal quotation marks omitted) (citing Weiler v. United States, 323 U.S. 606, 608 (1945)).  Indeed, the jury was instructed that "it is the law in federal courts that the testimony of a single accomplice or co-conspirator may be enough in and of itself to sustain a conviction, if the jury finds that the testimony establishes guilt beyond a reasonable doubt."  See Final Jury Charge at 64 (ECF No. 299).

[12]    Pursuant to the Court's order on the motions in limine, Castro's statements – including the statements about stealing over $20,000 – were introduced into evidence against all Defendants as a statement against penal interest.  See Court Order regarding Motions in Limine at 7-9 (ECF No. 244).

26

Motion (ECF No. 295).  For the reasons stated below, the government presented more than sufficient evidence of an effect on interstate commerce.

To obtain a conviction under the Hobbs Act, the government must prove that a completed, attempted, or planned crime "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do."  18 U.S.C. § 1951(a).  The Second Circuit has repeatedly held that the burden of proving this element is minimal and a showing of even a de minimis impact on commerce suffices.  See United States v. Jamison, 299 F.3d 114, 118 (2d Cir. 2002) ("We have long recognized that the requirement of showing an effect on commerce involves only a minimal burden of proving a connection to interstate commerce, and is satisfied by conduct that affects commerce in any way or degree.") (citations omitted); United States v. Fabian, 312 F.3d 550, 554 (2d Cir. 2002) ("Our precedent requires the government make only a de minimis showing to establish the necessary nexus for Hobbs Act jurisdiction") (abrogated on other grounds by United States v. Parkes, 497 F.3d 220 (2d Cir. 2007)); United States v. Elias, 285 F.3d 183, 188 (2d Cir. 2002) ("[T]his Court (along with other Circuits) has continued to hold that the Hobbs Act requires no more than a de minimis impact on interstate commerce" and providing that the nexus to interstate commerce need only be "minimal"); United States v. Mejia, 545 F.3d 179, 203 (2d Cir. 2008) (providing that "any . . . conduct having even a de minimis effect on interstate commerce suffices").  Thus, "if the defendants' conduct produced any interference with or effect upon interstate commerce, whether slight, subtle or even potential,[13] it is sufficient to uphold a

---

[13]    As discussed in greater detail below, the Court, at the Defendants' urging and over the government's objection, instructed the jury that an actual – and not a "potential" – effect on commerce was required.  The government continues to contend that a potential effect is legally sufficient but, for the reasons stated here, there was ample evidence of an actual effect on commerce resulting from the Defendants' conduct – as the jury found.

prosecution under the Hobbs Act." <u>United States v. Rose</u>, 891 F.3d 82, 86 (2d Cir. 2018) (citations and internal quotation marks omitted); <u>see also</u> <u>United States v. Jones</u>, 30 F.3d 276, 285 (2d Cir. 1994) (holding that a Hobbs Act conspiracy conviction only requires the possibility or potential of an effect on interstate commerce, not an actual effect) (citations omitted).

The Second Circuit has addressed a variety of ways in which this standard can be met where the robbery is of a business that trades in items that travel in interstate commerce. <u>See</u>, <u>e.g.</u>, <u>United States v. Orelien</u>, 119 F.4th 217, 224 (2d Cir. 2024) ("Evidence that the target of the robbery is a business that trades in an item that necessarily travels in interstate commerce will generally suffice to establish the robbery's effect on interstate commerce") (citations and internal quotation marks omitted); <u>United States v. Lee</u>, 834 F.3d 145, 153 (2d Cir. 2016) ("In Hobbs Act cases, an interstate nexus may be demonstrated where the government introduces evidence that the robbery was of a business (legal or illegal) that purchases a commodity that travels in interstate commerce. Evidence that the specific money or products targeted in a robbery had traveled in interstate commerce has never been required.") (citations and internal quotation marks omitted); <u>Jamison</u>, 299 F.3d at 120 (recognizing the "well-established rule that a robbery that depletes the assets of a business operating in interstate commerce will satisfy the jurisdictional requirement of the Hobbs Act by a minimal showing of effect on commerce").

The Second Circuit has also recognized ways in which the standard is met where the victim of the robbery is an individual, including:

> (i) where the victim directly participated in interstate commerce; (ii) where the defendant targeted the victim "because of her status as an employee at a company participating in interstate commerce"; (iii) where the assets of a company engaged in interstate commerce were, or would have been, depleted as a result of the harm or potential harm, respectively, to the individual victim; or (iv) where the defendant targeted the assets of a business engaged in interstate commerce rather than an individual.

United States v. Wilkerson, 361 F.3d 717, 729 (2d Cir. 2004) (quoting United States v. Perrotta, 313 F.3d 33, 37-38 (2d Cir. 2002)); see also United States v. Orelien, 119 F.4th 217, 224 (2d Cir. 2024).  As detailed below, a rational juror could have found a variety of these circumstances present based on the evidence admitted at trial.

The Defendants argue that the evidence presented at trial was insufficient to establish the requisite effect on interstate commerce.  In support of their claim, the Defendants assert that the government failed to establish the existence of a business at the Gambling Spot. Powell Rule 29 Mot. at 2-3 (ECF No. 329), Castro Rule 29 Mot. at 1 (ECF No. 295).  The Defendants also argue that even if the jury found that a gambling business existed, the government failed to establish that the business engaged in interstate commerce or that the victim of the robbery was the business, as opposed to individuals within the business.  For the reasons detailed below, the government presented ample evidence from which a rational juror could have concluded that the Defendants' conduct had at least a de minimis effect on commerce.

    a.    The Gambling Spot is a Business Dealing in Items That Travel in Interstate Commerce

As an initial matter, despite the Defendants' arguments to the contrary, there is no serious dispute that the Gambling Spot was a business, albeit an illegal business.[14]  Myhand

---

[14]    The fact that the Gambling Spot was an illegal business does not foreclose a finding that commerce was affected.  See United States v. Lee, 834 F.3d 145, 153 (2d Cir. 2016) (recognizing that interstate nexus may be demonstrated where the robbery was of a "business (legal or illegal) that purchases a commodity that travels in interstate commerce.") (citations and internal quotation marks omitted); see also United States v. Pandrella, No. 22-CR-2712, 2024 WL 1506969, at *2 (2d Cir. Apr. 8, 2024); Jones, 30 F.3d at 286 ("It is of no moment therefore that the commodity traveling in interstate commerce is illegal under federal law"); United States v. Wilkerson, 361 F.3d 717, 731 (2d Cir. 2004) (providing that the Second Circuit has "affirmed Hobbs Act convictions where the victims' businesses did not comply with all of the formalities observed in the legitimate business world and, indeed, even where the victims engaged in the buying and selling of contraband").

testified that he had been to the establishment around ten times prior to the night of the robbery and saw patrons betting cash on table games, like Cee-lo, in amounts of five to five hundred dollars. Tr. 371:1-4, 371:24-372:14. He also explained how patrons were invited to the Gambling Spot through a "link" that was texted to their phones and, once inside, there was a security guard who checked people before they entered.  Tr. 374:24-375:1, 376:21-24.  Crime scene photographs and body-worn camera footage taken in the hours after the robbery, which depicted gambling tables, dice and cards, corroborated Myhand's testimony.

The evidence established not only that the Gambling Spot was, in fact, an illegal gambling business, but that the Defendants targeted it for the robbery precisely because of this fact.  See United States v. Ortega, 71 F. App'x 92 (2d Cir. 2003) (affirming Hobbs Act robbery conspiracy conviction based on robbery of $220, jewelry and a VCR from a businessman outside of his home given the defendant's intent to steal $80,000 of proceeds thought to be derived from the victim's tire business because of the "effects . . . the intended robbery . . . would have had on interstate commerce").  Myhand testified that Coward had previously visited the Gambling Spot to gamble and that Myhand and Coward had successfully robbed the establishment at gunpoint approximately one year earlier of cash.  Additionally, while recalling the robbery during his confession to Gomez, Castro explained that the "sister of the owner" was there, a fact from which the jury could infer that Castro was aware that the establishment was a business.  Myhand also testified that, on the day of the robbery, Coward's cousin informed Coward and Myhand that a customer inside the gambling business had just "lost [$]50,000" and "came back with another [$]20,000."  Tr. 344:2-5.  This information directly motivated the Defendants' decision to target the Gambling Spot, as a business, for the robbery.  Tr. 344:6-12.

The evidence also established that multiple items offered for sale at the Gambling Spot moved in commerce.  Myhand testified that the establishment had "a kitchen area where they s[old] weed and s[old] alcoholic beverages," Tr. 362:20-21, including Heineken beer, Tr. 372:15-24, and that he and others had previously purchased Heineken there, Tr. 411:4-7.  Crime scene photographs and body-worn camera footage of the Gambling Spot depicted boxes of Heineken and Guinness beer along with liquor bottles including at least one bottle of Casamigos in the second room, and an open Heineken bottle in the bathroom adjacent to the back room where patrons gambled.  Officer Rice also testified that there was a Heineken beer bottle in the bathroom next to the back room.  Tr. 95:14-20.  The government presented testimony from representatives of Heineken USA and Diageo North America that Heineken beer, Guinness beer and Casamigos tequila are each brewed and bottled overseas – outside of New York – including in October 2020.  Tr. 1030:14-1031:8 (Heineken beer is brewed and bottled in Holland), 980:25-981:21 (Guinness beer is brewed and bottled in Ireland), 981:22-983:3 (Casamigos tequila is produced and bottled in Mexico).  From this evidence, the jury was entitled to conclude that the Gambling Spot was a business that traded in items traveling in "commerce" as that term is defined in the Hobbs Act.[15]

The Defendants argue that, although Myhand testified that he had previously bought alcohol, the government failed to establish that the Gambling Spot sold alcohol at the time of the robbery.  Powell Rule 29 Mot. at 7-8 (ECF No. 328), Castro Rule 29 Motion (ECF No. 295).  This argument is meritless because a rational jury could have inferred that the business was still

---

[15]     As set forth in the government's letter dated January 22, 2025, the Hobbs Act's definition of "commerce" does not distinguish between interstate and foreign commerce, covering instead "all commerce between any point in a State . . . and any point outside thereof . . . ." (ECF No. 263 at 2).  Even if the Gambling Spot acquired Heineken, Guinness and Casamigos products locally, the fact that the products originated outside of New York (in this case overseas) is sufficient to achieve the necessary effect on commerce.  Elias, 285 F.3d at 189.

operating in interstate commerce given the pictures and video showing alcohol on site—including in the kitchen area where Myhand testified the alcohol was sold—just hours after the robbery.

                b.      The Defendants' Robbery Had at Least a *De Minimis* Effect on Commerce

The evidence demonstrated that the Defendants' robbery of cash at the Gambling Spot affected the purchase and sale of items that moved in commerce in a number of ways, any of which satisfied the government's burden.

First, the robbery resulted in the prolonged shutdown of the establishment itself, thereby preventing it from offering Heineken, Guinness, and other items that moved in interstate commerce for sale. The evidence established that the Gambling Spot shut down for at least 48 hours as NYPD officers and medics responded to Maxwell's injuries and secured the crime scene, which prevented the establishment from receiving gambling or alcohol profits. Tr. 1848:14-17. This loss of money due to the closure is sufficient to show a de minimis effect on commerce. See United States v. Suggs, 14 F. Appx. 54, 56-57 (2d Cir. 2001) ("As to the robbery's effect on interstate commerce, the evidence showed: that the store was closed for three to four hours while the robbery was investigated; that the store lost several hundred dollars in sales during that closure; that the store sold numerous products manufactured outside the state; and that random sampling of vehicles frequenting the store included a significant number of cars with out-of-state license plates. This evidence is sufficient to demonstrate that the robbery had an actual or potential effect on interstate commerce.").

Second, the robbery depleted the establishment's assets, which could have been used to purchase items that moved in commerce. As detailed above, Castro stated that the Defendants stole about $20,000 during the robbery and Myhand testified that he robbed $1,200 from a woman who he understood to be associated with the business. See Tr. 391, 382:15-18

(identifying the female victim as "running control . . . that night that [Myhand] had robbed [the business]"); Tr. 376:23-24 (prior to robbing her, she asked if Myhand had received an invitation link or whether someone had invited him); Tr. 391:7-9 (woman ordered Myhand to take off his mask); 377:24-25, 378:1-5 (Myhand saw money in the woman's hand).  A rational juror could have concluded that at least some of the stolen money belonged to the business, which affected the business's ability to continue acquiring out-of-state goods.  This, too, suffices to show an effect on commerce.  See Elias, 285 F.3d at 189 (finding commerce affected where a robbed grocery store sold beer produced out of state and holding that "a robbery of a local distribution or retail enterprise may be said to affect interstate commerce if the robbery impairs the ability of the local enterprise to acquire—whether from out-of-state or in-state suppliers—goods originating out-of-state"); United States v. Mapp, 170 F.3d 328, 336 n.13 (2d Cir. 1999) (same); United States v. Jones, 30 F.3d 276, 285 (2d Cir. 1994) (using depletion-of-assets theory to support jurisdiction in a case where an undercover police officer was robbed of funds because the loss limited the amount of cocaine the officer could purchase in the future, and cocaine travels in interstate commerce).

Third, the evidence established that when Myhand robbed $1,200 from the woman who he believed to be "running control" of the Gambling Spot that night, he was targeting the assets of the business.  As detailed above, Myhand testified that after he was stopped by the "security guard" and asked to remove his mask, a woman who he understood to be "running control" of the Gambling Spot approached from the back room and asked "what's the situation." Tr. 374:24-376:20, 382:15-18 (describing the woman was "running control of that night").  The woman then asked Myhand whether he had received an invitation or link.  Tr. 376:23-24.  Myhand pulled out the gun and, after noticing that the woman had money in her hand, grabbed the money. Tr. 377:24-378:5; 549:24-550:25 (describing "stack" of cash in the woman's hand before robbing

33

her); 391:3-9 (explaining that he took approximately $1,200 from the woman).  Based on this evidence, a rational jury could infer that Myhand was targeting the assets of the business when he robbed the woman given her status and role at the Gambling Spot that night.  This inference was further supported by Castro's statement to Gomez that the owner's sister was at the Gambling Spot during the robbery, which provided another basis from which the jury could reasonably conclude that, given Myhand's and the Defendants' understanding of the woman's role in the business, they were targeting the assets of the gambling business when they robbed her or robbed her because of her status as an employee there, either of which suffices.  See Wilkerson, 361 F.3d at 729 (recognizing effect on commerce where the defendant targeted the victim "because of her status as an employee at a company participating in interstate commerce" or "targeted the assets of a business engaged in interstate commerce rather than an individual"); see id. at 732 (upholding Hobbs Act conviction of victims robbed at home where evidence showed defendant knew the victims owned the relevant business); Rose, 891 F.3d at 86 (finding effect on commerce where defendant ordered victim to withdraw money from a Citibank ATM because "although the victim withdrew the funds from an ATM and physically handed them to [the defendant] (under implicit threat of violence), the target of the robbery remained the same—Citibank").

The Defendants' remaining challenges to the jury's finding of an effect on commerce – namely, that the government failed to establish that assets of the business, rather than individuals, were taken – should be rejected.  Powell Rule 29 Mot. at 7-9 (ECF No. 328).  For the reasons stated above, there was ample evidence from which the jury could reasonably infer that the Defendants targeted and stole at least some money from the business.  The Defendants' suggestion that the government was required to establish the specific "source or ownership" of the $20,000 to meet this element is unsupported and similar arguments have been rejected.  See, e.g.,

United States v. Wilkerson, 361 F.3d 717, 731 (2d. 2004) ("On appeal, Wilkerson argues that there was insufficient evidence to satisfy the interstate element of the Hobbs Act, because the government offered no evidence as to the source of [the] money; [i.e.,] whether it was from [the Lopez brothers'] dishwashing job, from rent, from lawn mowing, or from all of these sources. Given the evidence discussed above, however, this is a red herring.  That some or all of the money Bilberto was carrying may have come from a source other than the landscaping business is of no moment, given that a rational juror could have inferred that Wilkerson had targeted the assets of the Lopez brothers' landscaping business and that at least some of the money Bilberto was carrying at the time of the hold up would have been used to purchase out-of-state supplies for that business.") (citations and internal quotation marks omitted).   Moreover, even assuming the Defendants targeted only the assets of individuals, a rational jury could have concluded that the Defendants' act of stealing over $20,000 from the patrons who were actively gambling and buying alcohol – which the Defendants perpetrated by repeatedly firing a gun into the crowd, causing the patrons to flee in terror and the Gambling Spot to shut down for a number of hours – interfered with and delayed the Gambling Spot's ability to continue engaging in commerce by, among other things, selling beer, and the patrons' ability to continue purchasing beer and gamble, which depleted the assets of the Gambling Spot.

In sum, the government presented ample evidence from which a rational jury could find that the Defendants' robbery had an actual effect on commerce.[16]

---

[16]    In addition to the reasons outlined above, the Defendants' robbery of gambling proceeds could alone have an impact on interstate commerce per se.  It is well-settled that the United States has jurisdiction over purely local "economic activities" if those activities "substantially affect interstate commerce."  See United States v. Lopez, 514 U.S. 549, 558–59 (1995) (identifying "three broad categories of activity that Congress may regulate under its commerce power," including "regulat[ing] those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.").  The

3.    Powell's Felon-in-Possession Conviction Was Supported by the Evidence
and Legally Proper

As detailed above, Powell was convicted of possessing ammunition after a prior

felony conviction, in violation of 18 U.S.C. 922(g)(1).  See S-1, Count Five (ECF No. 78).  Section

922(g) provides in relevant part that "[i]t shall be unlawful for any person . . . who has been

convicted in any court of[], a crime punishable by imprisonment for a term exceeding one year . .

. to . . . possess in or affecting commerce, any firearm or ammunition[.]"  Count Five of the

superseding indictment alleged that Powell was in possession of three .380 caliber cartridges—

two Federal and one Perfecta.  Id.  Powell argues that the conviction on Count Five should be

overturned because the jury was not instructed that it had to unanimously agree that Powell

possessed the same cartridge and the government failed to prove that Powell possessed any of the

cartridges.  See Powell Rule 29 Mot. at 11-18 (ECF No. 328).  Both arguments are meritless.

---

Supreme Court has held that such activities "may be regulated so long as they substantially affect
interstate commerce in the aggregate, even if their individual impact on interstate commerce is
minimal."  Taylor, 579 U.S. at 306 (citing Wickard v. Filburn, 317 U.S. 111, 125 (1942)
("[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may
still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on
interstate commerce")).

A gambling operation is a moneymaking endeavor plainly within the broad class of
"economic activities" qualifying as "commerce."  The Supreme Court and Second Circuit have
found that where other local economic activities of a similar nature, including drug trafficking
and money laundering, affect commerce in the aggregate, interstate commerce is affected.  See,
e.g., Taylor v. United States, 579 U.S. 301, 308-09 (2016) (holding that robbery or attempted
robbery of drugs or drug trafficking proceeds satisfies the commerce element per se because such
offense conduct necessarily affects the market for illegal drugs, over which the United States has
jurisdiction); United States v. Leslie, 103 F.3d 1093, 1100 (2d Cir. 1997) (describing money
laundering as the "archetypal activity which, while in isolation may not affect interstate
commerce, undoubtedly will have ramifications in interstate commerce when taken in the
aggregate"); United States v. Orelien, 119 F.4th 217, 224 (2d Cir. 2024) (declining to consider
whether robbery of a prostitution business affects commerce per se but affirming that a robbery
victim's prostitution business affects interstate commerce on the basis that it involves an
exchange of money for sexual services).  Like drug trafficking and money laundering, the
gambling operation—i.e., making bets for cash—is an inherently commercial activity that affects
commerce in the aggregate, which also establishes jurisdiction over the Defendants' robbery.

First, there is no requirement that the jury be instructed that they must unanimously agree to which cartridge Powell possessed.  It is well-established that the Sixth Amendment requires jury unanimity for determining the essential elements of a crime, but not for the specific means.  See Richardson v. United States, 526 U.S. 813, 817 (1999) (providing that although "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element," it "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element").  Here, the government's burden was to show that the defendant knowingly and intentionally possessed the ammunition charged in the indictment.  See Final Jury Charge at 61 (ECF No. 299).  In Richardson, the Supreme Court explained that disagreement about whether the defendant used a knife or a gun to satisfy the "threat of force" element of the alleged crime "would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force." 526 U.S. at 817.  Similarly here, the jury need only have found that the relevant element—that the defendant possessed ammunition—was established beyond a reasonable doubt.

Further, the jury instructions were proper in this regard.  "A 'general instruction on unanimity is sufficient to ensure that such a unanimous verdict is reached' as to the factual basis for a conviction, 'except in cases where the complexity of the evidence or other factors create a genuine danger of jury confusion.'"  United States v. Barner, 561 F. App'x 33, 38 (2d Cir. 2014) (quoting United States v. Schiff, 801 F.2d 108, 114–15 (2d Cir. 1986)).  Here, the Court instructed the jury that their "verdict on each count must be unanimous."  See Final Jury Charge at 24 (ECF No. 299).  There is no reason why a more detailed instruction was necessary.  Nor was it necessary for the jury instructions to have specified that the jury "had to unanimously agree that . . .

possession of just one [cartridge] would suffice," as Powell demands.  Powell Rule 29 Mot. at 12 (ECF No. 328); see also Barner, 561 F. App'x 33 at 38 (finding no error where the jurors were not instructed to "unanimously . . . determine that [the defendant] illegally possessed at least one of the particular firearms or rounds of ammunition seized from the storage room") (emphasis added). This is also consistent with how the Second Circuit applies the Sixth Amendment's unanimity rule to other aspects of the statute.  See, e.g., United States v. Estevez, 961 F.3d 519 (2d Cir. 2020) (holding that the defendant was not entitled to a specific jury instruction requiring that jury unanimously find on which date(s) the defendant possessed the firearm in question).

Second, the government presented ample proof of Powell's possession of the cartridges including video surveillance of Powell firing a gun at the front entrance and in the backyard of the Gambling Spot.  This evidence alone is sufficient to support the conviction.  The government also presented testimony from a medical examiner that Maxwell had been shot once in the back and once in the chest, consistent with where Powell and Castro were seen shooting Maxwell in the video footage.  The government also presented testimony from a crime scene investigator who recovered one .380 caliber casing at the front room, one .380 shell casing from the back room, and one .380 casing from the backyard, followed by testimony from Detective Bustamante that the casings recovered in the back room and backyard were fired by the same firearm.  This was consistent with the video surveillance showing the location of Powell and Castro as they shot their firearms and a rational juror could fairly conclude that Powell was the shooter of the .380 firearm because he was the only person captured on video surveillance firing a gun in the backyard.  Though, as Powell notes, Detective Deluca was unable to definitively testify that the casings were shot on October 7, 2020—the day of the Shooting—there is no such requirement, and a rational jury could conclude that, based on the evidence, the casings were from Powell's

firearm, particularly where Detective Deluca testified to recovering the shell casings in roughly the same locations as where Powell was depicted on video surveillance shooting a firearm. The government also presented a video of Powell brandishing a .380 firearm and stating, "my little .380," just 7 weeks before the robbery, showing Powell's ability to access firearms and, by inference, ammunition. GX 714B-4, 714B-R-V2.

C.    The Defendants Are Not Entitled to a New Trial

1.    Collateral Evidence About Carlos Gomez's Shooting Does Not Require a New Trial

The Defendants request a new trial under Rule 33 "based on newly discovered evidence unavailable before or during trial." See Coward Mot. at 3 n.2 (ECF No. 329).[17]  The Defendants argue that Gomez committed "fraud" by claiming that he was shot by masked men after being called a rat and "accus[ing] Mr. Coward of trying to kill him to prevent him from testifying at Mr. Coward's trial." Id. at 4.  They argue that this fraud "materially tainted and prejudiced" the defense because it "prevent[ed] [Gomez] from being cross-examined by defense counsel." Id. at 3-4.  In support of their argument, the Defendants cite legal precedent applicable when a witness has committed perjury at trial. See id. at 3-6.

The Defendants' arguments should be rejected.  As an initial matter, although the Defendants rely on cases involving witness perjury, the Defendants do not identify any specific portion of Gomez's testimony that they claim is perjurious.  Gomez did not testify about the Gomez Shooting during trial.  The Defendants' argument instead appears to be that they are entitled to a new trial because they were unable to impeach Gomez about his involvement in the Gomez Shooting and subsequent lies to law enforcement because such evidence was not known until after

---

[17]    Although only Coward moved for a new trial on the basis of newly discovered evidence, the other defendants joined his motion.

trial.  See id. at 4-6.  Where, as here, a defendant moves for a new trial based on evidence discovered after trial, a new trial is only appropriate where "the evidence would likely result in an acquittal."  Forbes, 790 F.3d at 406-07; see also Gordils, 982 F.2d at 72.  For the reasons detailed below, the Defendants are not entitled to a new trial because the newly discovered evidence relates to the entirely collateral matter of Gomez's own misconduct, his credibility was already impeached by evidence presented at trial, and there was ample independent evidence for the jury to convict the Defendants.

> a.  The Newly Discovered Evidence Would Not Have Altered the Jury's Verdict

As stated above, the Defendants move for a new trial because they were unable to cross-examine Gomez about the details of his lies concerning the Gomez Shooting since they were not discovered until after the trial concluded.  Specifically, the Defendants claim that cross-examining Gomez about his "willingness to falsely claim Coward had tried to kill him, and his willingness to hire others to participate in the fraud and shoot in him the leg would have called into serious question and disrepute every bit of testimony proffered by him."  Coward Mot. at 4 (ECF No. 329).

At the outset, the Defendants' motion contains several factual inaccuracies that require correction.  First, the Defendants claim that Gomez "accused Mr. Coward of trying to kill him to prevent him from testifying at Mr. Coward's trial."  Id. at 4; see also id. (claiming that cross-examining Gomez about his "willingness to falsely claim Coward had tried to kill him" would have called into question his overall testimony).  The Defendants also claim that, after initially notifying the Defendants about Gomez's shooting, "[t]he government immediately accused Mr. Coward of arranging the assassination to prevent Mr. Gomez from testifying at trial."  Id. at 3.  The Defendants make these claims without pointing to a single citation or court filing in

which Gomez or the government accused Coward of the shooting. In fact, Gomez did not testify about the Gomez Shooting at trial, and the government's January Letter—which the Defendants cite in support of these claims—does not accuse anyone of the alleged crime. See January Letter (ECF No. 245) (providing that Gomez informed federal agents that he had been shot after being approached by masked men who stated, "you better keep your mouth shut, you rat.").

Nor did the government seek to have Gomez's Shooting published to the jury as "other crimes" evidence, as the Defendants claim. See Coward Mot. at 4 (ECF No. 329) (claiming that "the government . . . sought to have this event published to the jury as 'other crimes' evidence."). To the contrary, in response to defense counsel's question to the Court in which they "assum[ed] that the Government [wa]s not going to be permitted to elicit testimony about the [Gomez] shooting," the government responded that it "d[id] not intend to elicit testimony about the shooting, but if the door is opened, the witness will be prepared to testify truthfully." Tr. 1508:8-15.

In any event, the Defendants have failed to satisfy multiple prongs of the "strict" standard for relief under Rule 33 based on newly discovered evidence, which requires a showing that: "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." Forbes, 790 F.3d at 406-07.

Turning to the first and second requirements, there is no dispute that evidence of Gomez's involvement in his shooting was discovered after trial and the government does not claim that the Defendants failed to use due diligence to obtain it. See Coward Mot. at 3 n.2 (ECF No. 329) ("As this request for a new trial is based on newly discovered evidence unavailable before or

during trial, the request is timely.").  As detailed above, the government notified the Court about

the two individuals' post-arrest statements implicating Gomez on February 7, 2025—the same day

of their arrests—and disclosed the information to the Defendants on February 20, 2025—several

weeks after the trial had concluded.

The Defendants' motion fails, however, because they have not established that the

newly discovered evidence is "so material and non-cumulative that its admission would probably

lead to an acquittal."  Gordils, 982 F.2d at 72.  It is well-established that:

> Evidence of impeachment evidence is material if the witness whose
> testimony is attacked supplied the only evidence linking the
> defendant to the crime, or where the likely impact on the witness's
> credibility would have undermined a critical element of the
> prosecution's case.  However, new impeachment evidence is not
> material, and thus a new trial is not required when the suppressed
> impeachment evidence merely furnishes an additional basis on
> which to impeach a witness whose credibility has already been
> shown to be questionable.

United States v. Choudhry, 330 F. Supp. 3d 815, 841 (E.D.N.Y. 2018), aff'd, 813 F. App'x 4 (2d

Cir. 2020) (internal quotation marks omitted) (quoting United States v. Wong, 78 F.3d 73, 79 (2d

Cir. 1996)); see also United States v. Hunter, 32 F.4th 22, 34 (2d Cir. 2022) ("With regard to

withheld impeachment evidence, a new trial is generally not required when the testimony of the

witness is corroborated by other testimony, or when the suppressed impeachment evidence merely

furnishes an additional basis on which to impeach a witness whose credibility has already been

shown to be questionable") (citations and internal quotation marks omitted); see also United States

v. Spinelli, 551 F.3d 159, 165 (2d Cir. 2008) ("[I]f the information withheld is merely cumulative

of equally impeaching evidence introduced at trial, so that it would not have materially increased

the jury's likelihood of discrediting the witness, it is not material.") (citations and internal

quotation marks omitted).  "Notably, information that is useful only for impeaching a government

42

witness, rather than directly contradicting the Government's case, only rarely meets this standard." United States v. Bin Laden, 397 F. Supp. 2d 465, 514 (S.D.N.Y. 2005) (citing United States v. Spencer, 4 F.3d 115, 119 (2d Cir. 1993) (providing that "[t]he discovery of new evidence which merely discredits a government witness and does not directly contradict the government's case ordinarily does not justify the grant of a new trial") (additional citations omitted)). The Defendants failed to meet this standard for several reasons.

First, because Gomez's credibility had already been impeached during trial, the additional impeachment resulting from cross-examination on the Gomez Shooting would have been cumulative. At trial, Gomez testified on direct and cross-examination that he had committed numerous criminal acts, including drug dealing, robbery, assault and even attempted to commit a murder-for-hire as an initiation for joining the Trinitarios gang. Tr. 1582:8-23, 1613:16–1614:9, 1631:31-1633:8. Defense counsel also cross-examined Gomez about being a cooperating witness and the benefits he was receiving from the government as a result. Tr. 1611:10-1619:23. Previously-disclosed § 3500 material also included extensive information about Gomez's prior criminal conduct. During rebuttal, the government not only acknowledged that Gomez was a convicted criminal who had pled to "serious crimes," but urged the jury to "scrutinize [Gomez's] testimony closely." Tr. 1961:5-12. Thus, even if the Defendants had been aware of the evidence relating to the Gomez Shooting, such evidence would have been cumulative because it would have "merely furnish[ed] an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," Choudhry, 330 F. Supp. 3d at 841, and would not have "materially increased the jury's likelihood of discrediting" Gomez. Spinelli, 551 F.3d at 165; see also Spinelli, 2007 WL 3231967, at *5 ("Even if the undisclosed impeachment material [that witness had withheld information from the government] had been used by the defense to its

43

greatest advantage, it merely would have evidenced what was already apparent—that [the witness] was a dangerous career criminal whose testimony required close scrutiny, as the jury was instructed."); see also Gordils, 982 F.2d at 72 (holding that new evidence impeaching credibility of government's key witness was cumulative of other evidence of witness's criminal activity).

Second, the newly discovered impeachment evidence related to Gomez's own misconduct, not the actual merits of the case, and thus did not (and could not) have "undermined a critical element of the prosecution's case" or "supplied the only evidence linking the defendant(s) to the crime." Choudhry, 330 F. Supp. 3d at 841. The evidence was therefore non-material as that term is understood in this context. Id.; United States v. Spencer, 4 F.3d 115, 119 (2d Cir. 1993) (evidence not material where "[p]ersuasive independent evidence supported the defendant's conviction").

Third, even if the evidence were non-cumulative and material, the Defendants' motion should still be denied because there is no reasonable probability that the evidence would have altered the jury's verdict. As detailed above, the newly discovered evidence was collateral to the crimes at issue, and decisive evidence of the Defendants' guilt came from independent sources. Among other things, at trial the jury heard testimony from Myhand that the Defendants planned the robbery as Coward drove them around Brooklyn and how, once inside, he stole roughly $1,200 from a woman before getting into a struggle with the security guard. Tr. 555:1-557:9. They also saw video surveillance of Powell, Castro and Myhand entering the Gambling Spot before shooting Maxwell and fleeing, and cell site location data showing the Defendants travel from Paterson, New Jersey, to the vicinity of the Gambling Spot around the time of the robbery and back to New Jersey.

Further, Gomez's testimony at trial was primarily limited to authenticating and providing context for the Castro Confession, and detailing the relationships between the

Defendants, including that they hung out at the Gas Station where they sold drugs. Additionally, the government presented evidence of the Defendants' relationships, including their connection to each other and to the Gas Station, through iCloud and social media evidence independent of Gomez's testimony. Thus, given Gomez's limited testimony, even if he had been impeached about the Gomez Shooting and the jury discredited him entirely, it cannot be said that the contemplated impeachment would have "likely" resulted in an acquittal.

This is especially true given that the narrator of the Castro Confession (identified by Gomez as Castro) recounts in detail the precise events of the robbery of the Gambling Spot, with which the jury was already familiar based on all of the other evidence in the case, including the surveillance video. The jury also learned – not through Gomez – that Castro had a link to the ABC News Video in his possession and had shown it to others; and Myhand had independently named Castro as being one of the robbers. In light of this other evidence, Gomez's identification of Castro as the speaker on the Castro Confession – while undoubtedly significant – is itself well corroborated, such that the effect of even additional impeachment concerning the Gomez Shooting would likely not have caused the jury to discredit Gomez on the limited point that it was Castro whom he recorded.

Lastly, the Defendants' arguments presume that had they been able to cross-examine Gomez about the Gomez Shooting and his lies to law enforcement about it, such cross-examination would have produced unmitigated benefits for them at trial. It is not clear that this is so, given that the impeachment likely would have demonstrated the lengths to which Gomez was willing to go to avoid testifying at the Defendants' trial, with the clear implication being that

45

Gomez would rather face additional time in prison and serious injury than testify against the Defendants. The net effect of this line of cross-examination is therefore difficult to predict.

Accordingly, the Defendants failed to meet their burden of demonstrating that they are entitled to a new trial based on newly discovered evidence and their motion should be denied.[18]

2.    Powell's Additional Arguments Do Not Require a New Trial

The additional arguments set forth in Powell's motion for a new trial, see ECF No. 331, also fail for the following reasons.

First, Powell repeats several arguments made in his motion for acquittal under Federal Rule of Criminal Procedure 29, including that the verdict was against the weight of the evidence; the government failed to establish an effect on interstate commerce and the Court's jury instruction was wrong; and the government's case relied heavily on Myhand's testimony which, Powell argues, was uncorroborated, inconsistent, and unreliable. See Powell Rule 33 Mot. at 1-4 (ECF No. 331). For the reasons stated above, the government proved the Defendants' guilt beyond a reasonable doubt; and Myhand's testimony was corroborated in numerous ways including, but not limited to, the video surveillance showing details leading up to and inside the Gambling Spot,

---

[18]    As stated above, the Defendants' argument that they are entitled to a new trial because Gomez perjured himself is baseless as they have failed to establish that Gomez lied under oath. See United States v. White, 972 F.2d 16, 20 (2d Cir. 1992) ("[W]hen the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury"). However, even if Gomez had perjured himself, a new trial is not required because the Defendants have not shown that any such lie was material which, like the legal framework for newly discovered impeachment evidence discussed above, requires a showing that "the jury probably would have altered its verdict had it known of the witness' false testimony." See United States v. Wallach, 935 F.2d 445, 458 (2d Cir. 1991).

cell site location data showing the Defendants' locations before and after the robbery, and phone records of calls between Myhand and Coward prior to the robbery.

Nor is a new trial required on the basis that the Court erred in its jury instructions regarding the requisite effect on interstate commerce. At the insistence of defense counsel, the Court instructed the jury that it must find that the Defendants' conduct had an actual – as opposed to potential – effect on commerce. Tr. 1403:24-1414:5. Specifically, the Court instructed the jury that "the Government must prove . . . that the robbery affected interstate or foreign commerce in any way or degree," and that the effect "can be very slight or minimal. Even a subtle or de minimis effect on commerce will suffice." Tr. 2025:2-13. The Court also stated "[i]f you decide that interstate or foreign commerce would have been affected if . . . a defendant successfully and fully completed his actions, then the element affecting interstate or foreign commerce is satisfied. . . . The Government satisfies its burden of proving an effect on interstate or foreign commerce if it proves any effect, whether it was harmful or not." Tr. 2025:15-23. During the jury charge conference, the Court noted that the case law repeatedly refers to a potential effect on interstate commerce without distinguishing between choate and inchoate offenses, and the Defendants' position that the government must prove an actual effect on commerce for a completed Hobbs Act robbery is "invisible in Second Circuit case law." Tr. 1404:10-21, 1406:7-1410:7 (citing United States v. Spear-Zuleta, 22 WL 17347243, at *3 (2d Cir. Dec. 2022)); see also United States v. Pandrella, No. 22-CR-2712, 2024 WL 1506969, at *2 (2d Cir. Apr. 8, 2024), cert. denied, 145 S. Ct. 380 (2024) (in Hobbs Act robbery case, holding that "there was sufficient evidence for the jury to conclude that Pandrella's theft of the luxury watches depleted Zito's business assets, and therefore had at least a potential effect on interstate commerce."). However, after hearing the government's argument about how commerce was affected, the Court indicated that it did not think

the issue mattered on the facts and, after a lengthy colloquy, ultimately adopted the Defendants' request to remove the word "potential" from the instructions.  Id.; 1420:14-17, 1426:19-1427:15 (Court providing that "in the interest of not trying this case twice, we should indulge the defense here even if the answer is not entirely clear.  It is the better answer even if it's not a perfect answer.").  Thus, there was no error in this instruction requiring a new trial and, in fact, the Court applied a more favorable instruction than supported by the case law at the request of the Defendants.

Second, Powell argues that ballistics expert Detective Bustamante's conclusions about the shell casings were unreliable and violated Daubert standards because he determined that the origin of the Perfecta cartridge was inconclusive.  See Powell Rule 33 Mot. at 2 (ECF No. 331).  Although the government holds the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, see Daubert v. Merrell Dow Pharmaceuticals, Inc, 509 U.S. 579, 593 n.10, the district court is the ultimate "gatekeeper."  See Fed. R. Evid. 104(a); United States v. Cruz, 363 F.3d 187, 192 (2d Cir. 2004).  The district court's inquiry into the reliability of expert testimony under Rule 702 is a "flexible one."  Daubert, 509 U.S. at 594.  In assessing reliability, "the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks omitted).

Here, Powell fails to explain how Detective Bustamante's methodology as to the Perfecta cartridge casing was inconsistent with his methodology for the two Federal cartridge casings or otherwise unreliable.  At trial, Detective Bustamante explained that to conduct his

48

ballistic analysis, he looks at "class characteristics," which are "predetermined measurable features that are intended by the manufacturer during the manufacturing process of that firearm," like the caliber of a firearm, and "individual characteristics," which are "microscopic imperfections that are caused during the manufacturing process" of a firearm and are unique to a firearm, that are left on a shell casing after it is fired.  Tr. 751:25-753:10.  He then described how he conducted his analysis of the three .380 cartridge casings and concluded that the two .380 cartridge casings, which were manufactured by Federal, were fired from the same gun "based on an agreement of class characteristics and a sufficient agreement of individual characteristics," but the third .380 cartridge casing, which was manufactured by Perfecta, was inconclusive – "meaning that there was an agreement of class characteristics, but the individual characteristics, there wasn't enough . . . data for me to interpret it being fired from the same gun or not."  Tr. 765:4-766:2.  The jury heard Detective Bustamante's testimony and was able to consider the reliability of his ballistics analysis and methodology compared to the other evidence presented in the case.   Defense counsel was free to explore any deficiencies with Detective Bustamante's methodology or conclusions during cross-examination so that the jury could consider them—a right they declined to take, Tr. 768:25-769:5—or point out any deficiencies during summation.  The <u>Daubert</u> challenge is baseless and should be rejected.

   <u>Third</u>, Powell argues that he is entitled to a new trial because Castro's reference to "Payback" in the Castro Confession violated <u>Bruton v. United States</u>, 391 U.S. 123 (1968) and the Confrontation Clause.  <u>See</u> Powell Rule 33 Mot. at 2-3 (ECF No. 331).  For the reasons stated in the Court's order on the motions <u>in limine</u>, because the statements in the Castro Confession "are non-testimonial and are admissible over a hearsay objection (from any defendant), their admission [] neither offend[ed] any codefendant's confrontation rights nor require[d] severance of the

codefendants' trials under <u>Bruton v. United States</u>, 391 U.S. 123 (1968)."  Court Order regarding Motions <u>in</u> <u>Limine</u> at 9 (ECF No. 244).

<u>Fourth</u>, Powell claims that portions of the government's summation were improper, including the government's argument that the Gambling Spot had "out-of-state" connections affecting interstate commerce and that the jury should credit Castro's statement that they stole over $20,000.  <u>See</u> Powell Rule 33 Mot. at 5-6 (ECF No. 331).  The Second Circuit has repeatedly recognized that "the Government has broad latitude in the inferences it may reasonably suggest to the jury during summation." <u>United States v. Gershman</u>, 31 F.4th 80, 101 (2d Cir. 2022) (citations and internal quotation marks omitted).  "So long as a prosecutor does not 'misstate the evidence,' he or she is entitled to 'wide latitude during closing arguments.'" <u>United States v. Rainford</u>, 110 F.4th 455, 473 (2d Cir. 2024) (quoting <u>United States v. Tocco</u>, 135 F.3d 116, 130 (2d Cir. 1998)). Though "the government must refrain from "vouching for the credibility of its witnesses or suggesting facts not in evidence," <u>United States v. Newton</u>, 369 F.3d 659,681 (2d Cir. 2004), the government may refer to items that are in evidence and call upon the jury to draw conclusions that are fairly inferable from the evidence.  <u>See</u> <u>United States v. Rainford</u>, 110 F.4th 455, 473 (2d Cir. 2024) (holding that the government, in telling the jury at summation that the "witnesses were telling the truth," "did not imply the existence of extraneous proof and cannot be characterized as improper vouching" because "the government surrounded these statements with references to items submitted into evidence").

Here, both statements that Powell claims were improper were fully supported by the evidence at trial and appropriate for summation.  First, as stated above, Myhand testified that he bought Heineken from the Gambling Spot, and the Heineken USA representative testified that Heineken is bottled and brewed in Holland.  Thus, the government's statement that the Gambling

Spot had "out-of-state" connections was entirely reasonable based on the evidence. Second, it was not improper to argue that the jurors could credit Castro's statement that the Defendants stole over $20,000 – a statement that the jurors all heard Castro say for themselves on the recording – given that this argument was made in light of all the ways in which the Castro Confession was corroborated by other evidence. Even if the government's remarks were improper (they were not), the Defendants' motion should still be denied because "a defendant will succeed on a misconduct claim only when the remarks, taken in the context of the entire trial, resulted in substantial prejudice." Rainford, 110 F.4th at 473 (citations omitted). Here, the Defendants have not asserted any prejudice, let alone substantial prejudice.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the Defendants' motions in their entirety.

Dated:       Brooklyn, New York
             July 10, 2025

                                        Respectfully submitted,

                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        Attorney for Plaintiff
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Andrés Palacio
Megan Larkin
Raffaela S. Belizaire
Assistant United States Attorneys
(Of Counsel)